# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued May 1, 2014          Decided August 15, 2014

No. 12-1481

MINISINK RESIDENTS FOR ENVIRONMENTAL PRESERVATION
AND SAFETY, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MILLENNIUM PIPELINE COMPANY, L.L.C.,
INTERVENOR

————

Consolidated with 13-1018

————

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

————

*Carolyn Elefant* argued the cause and filed the briefs for petitioners.

*Karin L. Larson*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *David L. Morenoff*, Acting General Counsel, and *Robert H. Solomon*, Solicitor.

*Aaron M. Streett* argued the cause for intervenor. On the brief were *Joseph Koury* and *Ryan J. Collins*.

Before: KAVANAUGH, MILLETT and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Given the choice, almost no one would want natural gas infrastructure built on their block. "Build it elsewhere," most would say. The sentiment is understandable. But given our nation's increasing demand for natural gas (and other alternative energy sources), it is an inescapable fact that such facilities must be built somewhere. Decades ago, Congress decided to vest the Federal Energy Regulatory Commission with responsibility for overseeing the construction and expansion of interstate natural gas facilities. And in carrying out that charge, sometimes the Commission is faced with tough judgment calls as to where those facilities can and should be sited. These petitions present one such example.

In July 2012, the Commission approved a proposal for the construction of a natural gas compressor station in the Town of Minisink, New York. Many local residents, hoping to thwart that result, banded together to fight the compressor station's development. They formed a group called "Minisink Residents for Environmental Preservation and Safety" ("MREPS") and mounted a vigorous, but ultimately unsuccessful, campaign opposing the project. Undeterred, MREPS and several of its individual members now petition for our intervention. In doing so, they mainly argue that the Commission's approval of the project was arbitrary and capricious, particularly given the existence of a nearby alternative site they insist is better than the Minisink locale

green-lighted by FERC. They also assail some of the Commission's procedural calls along the way. Though we respect the concerns they raise, we conclude that, as a legal matter, the Commission's decisions were both reasonable and reasonably explained. Consequently, we deny the petitions for review.

## I.

We begin with a quick overview of the regulatory framework, before turning to the particulars of these petitions.

## A.

Congress enacted the Natural Gas Act, ch. 556, 52 Stat. 821 (1938) (codified as amended at 15 U.S.C. §§ 717-717z), with the principal aim of "encourag[ing] the orderly development of plentiful supplies of . . . natural gas at reasonable prices," *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669-70 (1976), and "protect[ing] consumers against exploitation at the hands of natural gas companies," *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 610 (1944). Along with those main objectives, there are also several "'subsidiary purposes'" behind the NGA's passage, "includ[ing] 'conservation, environmental, and antitrust' issues." *Pub. Utils. Comm'n of Cal. v. FERC*, 900 F.2d 269, 281 (D.C. Cir. 1990) (quoting *NAACP*, 425 U.S. at 670 & n.6).

The Act vests FERC with broad authority to regulate the transportation and sale of natural gas in interstate commerce. 15 U.S.C. §§ 717b, 717c; *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 301 (1988) ("FERC exercises authority over the rates and facilities of natural gas companies used in [interstate] transportation and sale."). To achieve this

objective, Congress equipped the Commission with a variety of regulatory tools, one of which captures the focus of our review today.

Under Section 7(c) of the Act, before an applicant can construct or extend an interstate facility for the transportation of natural gas, it must obtain a "certificate of public convenience and necessity" from the Commission. 15 U.S.C. § 717f(c)(1)(A); *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 240 (D.C. Cir. 2013). The statute provides that a certificate "shall be issued to any qualified applicant" upon a finding that "the applicant is able and willing properly to do the acts and to perform the service proposed . . . and that the proposed service" and "construction . . . is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). FERC may, in issuing such a certificate, attach "such reasonable terms and conditions as the public convenience and necessity may require." *Id.*; *Murray Energy Corp. v. FERC*, 629 F.3d 231, 234 (D.C. Cir. 2011).

The Commission has issued a policy statement outlining the criteria it considers in reviewing such certificate applications. *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (Sept. 15, 1999), *clarified*, 90 FERC ¶ 61,128 (Feb. 9, 2000), *further clarified*, 92 FERC ¶ 61,094 (July 28, 2000) ("*Certificate Policy Statement*"). The Commission will first confirm "whether the project can proceed without subsidies from the[] existing [pipeline's] customers." *Id.*, 88 FERC ¶ 61,227, at 61,745. Then, it will "balanc[e] the public benefits against the adverse effects of the project." *Id.*, 90 FERC ¶ 61,128, at 61,396. FERC will approve a project only "where the public benefits of the project outweigh the project's adverse impacts." *Id.*; *see also Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 649 (D.C. Cir. 2010) (Brown, J., concurring in part and

dissenting in part) (summarizing the factors examined under FERC's *Certificate Policy Statement*).[1]

In conjunction with the certificating process, the Commission must also complete an environmental review of the proposed project, as mandated by the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370h. *E.g.*, *Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 967 (D.C. Cir. 2000). Simply stated, the Commission's NEPA obligation requires that it "'identify the reasonable alternatives to the contemplated action' and 'look hard at the environmental effects of [its] decision[].'" *Id.* (quoting *Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 374 (D.C. Cir. 1999)) (alterations in original).

**B.**

For years, Millennium Pipeline Company ("Millennium") has owned and operated a natural gas pipeline system extending across much of New York's southern border. In July 2011, seeking to expand its service capacity, Millennium applied to the Commission for a certificate of public convenience and necessity that would allow for the

---

[1] The "public benefits" the Commission examines "could include, among other things, meeting unserved demand, eliminating bottlenecks, access to new supplies, lower costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives." *Certificate Policy Statement*, 90 FERC ¶ 61,128, at 61,396. On the other side of the scale, the potential "adverse effects" the Commission will consider are "the effects on existing customers of the applicant, the interests of existing pipelines and their captive customers, and the interests of landowners and the surrounding community, including environmental impacts." *Id.*

construction and operation of a natural gas compressor station along its existing pipeline. Joint Appendix ("J.A.") 304-19. The proposed site for the project was located in the Town of Minisink, New York.

As explained in its application to FERC, the aim of Millennium's project was twofold. First, the new station would allow Millennium to increase natural gas deliveries to its eastern interconnection by about 225,000 additional dekatherms per day. Second, the compressor would enable bi-directional gas flow on an existing segment of Millennium's pipeline. J.A. 305. The project's footprint, as proposed by Millennium, would consist of: (a) two 6,130-horsepower natural gas-fired compressor units, to be housed in a newly built structure; (b) an additional 1,090 feet of pipe connecting the compressor station to the existing pipeline; (c) and several ancillary facilities, including a new mainline valve, an access driveway, a station control/auxiliary building, intake and exhaust silencers, and a filter-separator with a liquids tank. The compressor station was to be sited on a small part of a much larger, 73.4-acre parcel—a parcel acquired and owned by Millennium. *See* J.A. 305-07. We refer to Millennium's proposal as the "Minisink Project."

Consistent with agency regulations, notice of the proposed Minisink Project was published in the Federal Register. *See* 76 Fed. Reg. 46,786 (Aug. 3, 2011). Around the same time, the Commission issued a "Notice of Intent to Prepare an Environmental Assessment," which was sent to a range of interested stakeholders, including lawmakers, potentially affected landowners, and environmental and public-interest groups. In the months following, Millennium sponsored a community meeting at the Minisink Town Hall so that those interested could learn more about the proposal and voice their views. FERC also hosted its own meeting in

Minisink concerning the proposal. As might be expected, the Minisink Project sparked its fair share of local interest; during the review process, the Commission received hundreds of verbal and written comments. *See* J.A. 8-9.

Most significantly for our purposes, several residents urged Millennium and the Commission to pursue a nearby alternative site for the compressor station—what came to be known as the "Wagoner Alternative." Under the Wagoner Alternative, Millennium would construct a smaller, 5,100-horsepower compressor station directly adjacent to its existing Wagoner Meter Station, a site located along the pipeline about seven miles northwest of Minisink. J.A. 10-11. This alternative, its proponents insisted, was far better suited for the project, in large part because it was less residentially dense than the site proposed in Minisink. *See, e.g.*, J.A. 347-50. But it came with a catch: Its implementation would require the replacement of a 7-mile segment of pipe along the pipeline—a segment the parties call the "Neversink Segment" due to its crossing of the Neversink River; according to Millennium, no such upgrade would be required by the Minisink Project. *See* J.A. 390-91. Reacting to commenters who were pushing the Wagoner Alternative, FERC sent notice to landowners within the vicinity of the Wagoner Meter Station site and along the Neversink Segment, inviting their input and comments on the concept. J.A. 372-74. The Commission incorporated the feedback it received into its review of Millennium's proposal.

FERC released its Environmental Assessment ("EA") for the Minisink Project several months later. *See* J.A. 428-97. Along with its detailed evaluation of the project's likely environmental impacts—on water resources, vegetation and wildlife, air quality and noise, and more—the EA also analyzed several alternatives to Millennium's proposal,

including an in-depth comparison between the Minisink Project and the Wagoner Alternative. J.A. 474-89. The EA did identify some positive environmental upshots associated with the Wagoner Alternative, *see* J.A. 484-89, but, on balance, the assessment found that the Minisink Project was environmentally preferable, due principally to the negative environmental consequences that would flow from an upgrade of the Neversink Segment, J.A. 489 ("[T]he greater environmental issues and landowner impacts of replacing the Neversink Segment cause us to conclude that the Wagoner Alternative does not provide a significant environmental advantage over the proposed project."). Overall, the EA concluded that, so long as Millennium implemented certain mitigation measures, the Minisink Project was expected to have no significant environmental impact. J.A 490-94.

After receiving and reviewing a slew of comments concerning the EA, FERC ruled on Millennium's application in July 2012. By a 3-2 majority, the Commission voted to issue a certificate of public convenience and necessity to Millennium, allowing the Minisink Project to move forward. *Millennium Pipeline Co., L.L.C.*, Order Issuing Certificate, 140 FERC ¶ 61,045 (July 17, 2012) ("*Certificate Order*") (*reprinted at* J.A. 2-50).

The Commission began its analysis by applying the criteria set forth in its Certificate Policy Statement, first finding the threshold factor satisfied—that the project would not require any subsidization from Millennium's existing customers. *Certificate Order*, ¶¶ 11-12. From there, the Commission weighed the project's benefits (increased capacity to customers in the high-demand northeast market, among others) against what FERC viewed as its "minimal adverse effect[s]," both market- and environmentally-focused. In the end, the Commission concluded that "the public

convenience and necessity require[d] approval of Millennium's proposal," subject to certain environmental conditions. *Id.* ¶¶ 13-15.

The Commission undertook an extensive environmental analysis in its order, leaning heavily on the results of the EA. With respect to the Wagoner Alternative, in particular, the Commission explained as follows:

> The EA evaluated several system and aboveground site alternatives, and thoroughly compared the Wagoner Alternative to Millennium's proposed Minisink Compressor Station. . . . Ultimately, the EA concludes that although there are certain advantages to the Wagoner Alternative (primarily, its greater distance from the nearest noise-sensitive areas and the lack of residences within 0.5 mile of the compressor site), the greater environmental issues and landowner impacts of replacing the Neversink Segment outweigh those advantages, and as a whole result in the Wagoner Alternative not providing a significant environmental advantage over the proposed project. The Commission concurs with this assessment.

*Certificate Order*, ¶¶ 26-27. More broadly, the Commission also addressed a variety of other comments touching on environmental and landowner-related issues. At the end of the day, FERC adopted the EA's findings and concluded that, so long as Millennium adhered to the parameters outlined in its application and complied with certain environmental mitigation measures, the Minisink Project was expected to have no significant environmental impact. *Id.* ¶ 83.

The Commission's order also resolved a few procedural matters that had been raised. First, the Commission denied a request for a full-blown evidentiary hearing for the Minisink

Project, concluding that the issues at stake could be adequately addressed on the written record. The Commission also denied a request to stay the proceedings due to a resident's pending Freedom of Information Act (FOIA) request for documents from the Commission (generally seeking certain hydraulic analyses and systems models that Millennium submitted to FERC during the application process). *Id.* ¶¶ 84-87.

As noted, the Commission's determination was not unanimous; the approval of Millennium's application drew two dissenting votes. At bottom, both dissenters—Chairman Wellinghoff and Commissioner LaFleur—explained that, in their eyes, the Wagoner Alternative was a preferable alternative to the Minisink Project, and that the Commission was wrong to conclude otherwise. *See* J.A. 41-47. In addition, Commissioner Clark issued a separate concurrence, highlighting his view that, even if one truly thought the Wagoner Alternative wrought lesser environmental impacts than the Minisink Project, so long as Minisink was still considered "*an acceptable site* that produces minimal adverse impacts," it should still be approved because FERC need not limit its approval to sites with "*the minimum impact*." J.A. 48 (second emphasis in original).

Following the Commission's approval, MREPS and others sought rehearing, and the Commission denied those requests through another thorough order. *Millennium Pipeline Co., L.L.C.*, Order Denying and Dismissing Requests for Rehearing, Denying Request to Reopen and Supplement the Record, and Denying Requests for Stay, 141 FERC ¶ 61,198 (Dec. 7, 2012) ("*Reh'g Order*") (*reprinted at* J.A. 52-96). Therein, after considering and rejecting various challenges to its initial decision, FERC reaffirmed its certificate approval for the Minisink Project. Additionally,

the Commission denied a request to reopen and supplement the record to include a study prepared by Mr. Richard Kuprewicz, who we are told is an "industry expert on pipeline engineering and safety." Pet'rs' Br. at 22-23. The Commission reached that result after determining that "Mr. Kuprewicz's study provide[d] no basis for reversing [its] approval of the Minisink Project." *Reh'g Order*, ¶¶ 75-80. Finally, FERC denied a request to stay construction on the Minisink Project pending judicial review. *Id.* ¶¶ 81-83.[2] Chairman Wellinghoff and Commissioner LaFleur again dissented, jointly reiterating their view that the Wagoner Alternative still stood superior to the Minisink Project. *See* J.A. 95-96.

In January 2013, Minisink resident Michael Mojica filed a separate request for rehearing with FERC, focusing on (1) the Commission's refusal to reopen the record to consider Mr. Kuprewicz's study, and (2) Mr. Mojica's claimed inability to timely obtain information he believed necessary to oppose Millennium's application (essentially the documents pursued via the aforementioned FOIA request). The Commission, joined this time by Chairman Wellinghoff and Commissioner LaFleur, unanimously denied the rehearing request. *Millennium Pipeline Co, L.L.C.*, Order Denying Rehearing, 142 FERC ¶ 61,077 (Jan. 31, 2013) ("*Second Reh'g Order*") (*reprinted at* J.A. 99-106).

---

[2] Before construction on the Minisink Project was complete, Petitioners twice sought emergency stays from this Court as well. On both occasions we denied their requests. *In re Minisink Residents for Pres. of the Env't and Safety*, No. 12-1390 (D.C. Cir. Oct. 11, 2012) (denying motion for emergency relief); *Minisink Residents for Envtl. Pres. and Safety v. FERC*, No. 12-1481 (D.C. Cir. Mar. 5, 2013) (denying petition for stay during pendency of these proceedings).

Meanwhile, MREPS commenced proceedings before this Court. In December 2012, MREPS and some of its members filed a petition seeking review of the Commission's Certificate Order and Rehearing Order (Case No. 12-1481). Then, after his individual rehearing request was denied by FERC, Mr. Mojica separately petitioned for our review (Case No. 13-1018).[3] Given the sweeping overlap of issues, we consolidated the two petitions. We refer to MREPS and the various individual petitioners, collectively, as "Petitioners."

While the briefing in these appeals unfolded, Millennium completed construction of the Minisink Project and placed the compressor station into use in June 2013.

## II.

Petitioners seek review of a final order of the Commission, which means we have jurisdiction under 15 U.S.C. § 717r(b). *E.g.*, *Murray Energy Corp.*, 629 F.3d at 235; *Fla. Gas Transmission Co.*, 604 F.3d at 639.

We review the Commission's orders, including those approving certificate applications, under the familiar arbitrary and capricious standard. *B&J Oil & Gas v. FERC*, 353 F.3d 71, 75-76 (D.C. Cir. 2004); *Midcoast Interstate Transmission*, 198 F.3d at 967. Our role is limited "to assuring that the Commission's decisionmaking is reasoned, principled, and

---

[3] Originally, Mr. Mojica was also a party to the first-filed petition, but given the pendency of his rehearing request before FERC at that time, he withdrew from participation in the original case to avoid any problems under *Tennessee Gas*. *See Tenn. Gas Pipeline Co. v. FERC*, 9 F.3d 980, 980-81 (D.C. Cir. 1993) ("It is well-established that a party may not simultaneously seek both agency reconsideration and judicial review of an agency's order.").

based upon the record." *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010); *Penn. Office of Consumer Advocate v. FERC*, 131 F.3d 182, 185 (D.C. Cir. 1997). We must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1083 (D.C. Cir. 2002). In so doing, we "cannot substitute [our] judgment for that of the Commission." *Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004). All the while, we remain mindful that "[t]he grant[] or denial of a certificate of public convenience and necessity is a matter peculiarly within the discretion of the Commission." *Okla. Natural Gas Co. v. Fed. Power Comm'n*, 257 F.2d 634, 639 (D.C. Cir. 1958); *accord Cal. Gas Producers Ass'n v. Fed. Power Comm'n*, 383 F.2d 645, 648 (9th Cir. 1967).

\*  \*  \*

As a threshold matter, and even though neither FERC nor Millennium contests our power to entertain these petitions, we have independently assured ourselves that we are presented with a justiciable controversy. While the Minisink Project is now finished and functional, the petitions under review are not moot because Petitioners, through their written submissions to this Court and to the Commission, assert that the compressor's operation continues to harm their aesthetic, health, and property interests. *See Moreau v. FERC*, 982 F.2d 556, 566 n.4 (D.C. Cir. 1993). For much the same reasons, we are satisfied that Petitioners have suffered injuries sufficient for Article III standing. *Id.* at 565. With this much established, we turn to the merits of Petitioners' arguments.[4]

---

[4]  Our analysis on these points does not rest in any way on the online video submission referenced in Petitioners' brief. *See* Pet'rs'

**A.**

In urging us to upend FERC's approval of the Minisink Project, Petitioners mount several lines of attack. Chief among them is their argument that the Commission failed to afford due consideration to the Wagoner Alternative, which Petitioners insist was undeniably superior to the Minisink Project—in their eyes, "economically, environmentally, and operationally" superior. *See* Pet'rs' Br. at 6. Specifically, Petitioners claim that this alleged failure both violated the Commission's obligations under Section 7 of the NGA, and represented a misapplication of the Commission's own Certificate Policy Statement. We disagree.

We do agree with Petitioners that the Commission was obligated to consider, as part of its certificating process under the NGA, reasonable alternatives to the project proposed by

---

Br. at 5, 27-28. A picture may be worth a thousand words in some contexts, but extra-record video clips cannot substitute for proper briefing. Where a party's standing is not apparent from the agency record, our rules require that "*the brief . . .* include arguments and evidence establishing the claim of standing." D.C. CIRCUIT RULE 28(a)(7) (emphasis added). Petitioners' choice to use "Video Testimonials" skirts this requirement, and if adopted more broadly, could wreak havoc on the procedural controls governing appeals before this Court, such as word limits, briefing schedules, and the like. And this is without even considering the specific failings associated with Petitioners' video account. For one, there is no indication that the individuals it portrays are under oath, so their remarks are not even evidence. Moreover, Petitioners do not direct us to any *particular* segment of the video they deem relevant, whether through a pinpoint citation or otherwise; instead, they expect us to review the entirety of the 18-minute recording—which, it bears noting, spans more time than their counsel was allotted at oral argument—to discern the elements of standing.

Millennium. *See, e.g.*, *N. Natural Gas Co. v. Fed. Power Comm'n*, 399 F.2d 953, 973 (D.C. Cir. 1968) ("[T]he duty imposed upon the Commission by Section 7 of the Natural Gas Act is not merely to determine which of the submitted applications is most in the public interest, but also to give proper consideration to logical alternatives which might serve the public interest better than any of the projects outlined in the applications."); *accord Citizens for Allegan Cnty., Inc. v. Fed. Power Comm'n*, 414 F.2d 1125, 1133 (D.C. Cir. 1969). The trouble with Petitioners' theory, though, is that the Commission satisfied this obligation here. Based on our assessment of the record, we are convinced that the Commission amply considered alternatives to the Minisink Project, devoting especially thorough attention to the Wagoner Alternative favored by Petitioners.

For one, FERC's Certificate Order unmistakably outlines the Commission's exploration of the Wagoner Alternative as an alternate possibility for Millennium's compressor station. *See Certificate Order*, ¶ 26 ("Numerous comments received during scoping also requested that the Commission evaluate alternatives to the proposed action . . . . The EA evaluated several system and aboveground site alternatives, and thoroughly compared the Wagoner Alternative to Millennium's proposed Minisink Compressor Station."). In keeping with the recommendations set out in the EA, however, the Commission concluded that the more significant environmental impacts associated with the Wagoner Alternative—mostly due to improvement of the Neversink Segment—rendered that option less preferable than the proposed Minisink Project. *Id.* ¶ 27 (summarizing some of the perceived environmental downsides to the Wagoner

Alternative).[5]  The same holds true with respect to the Rehearing Order, wherein the Commission again walked through its comparison of the Minisink Project and the Wagoner Alternative. *Reh'g Order*, ¶¶ 66-67.  Based on that comparison, the Commission reiterated its view that "the selection of the Minisink [Project] as opposed to the Wagoner Alternative is eminently reasonable." *Id.* ¶ 67.

Furthermore, Petitioners seem to overlook the fact that, once the Wagoner Alternative surfaced, the Commission took the additional (and, from what we understand, relatively unusual) step of issuing a supplemental notice before completing its Environmental Assessment.  Therein, the Commission specifically flagged its consideration of the Wagoner Alternative, inviting feedback and input from nearby residents and other potentially impacted parties.  *See* J.A. 372-74; J.A. 373 ("The Commission wants to ensure that

---

[5]  For instance, the Commission explained as follows:

- The Wagoner Alternative would impact ten times more land acreage (112.4) than the Minisink Project (10.6);

- The Wagoner Alternative would require the clearing of more trees and the conscription of more agricultural land than the Minisink Project;

- The Wagoner Alternative would necessitate the placement of pipeline across eleven wetlands and twelve waterbodies, raising complications not extant in the Minisink Project; and

- The Wagoner Alternative had the potential to impact five special status species, as opposed to one through the Minisink Project.

*Certificate Order*, ¶¶ 26-27.  FERC's Certificate Order also incorporated the EA itself, which goes through its own relatively detailed comparison between the two proposals. *See* J.A. 484-89.

all potentially affected landowners for the [Wagoner] alternative have the opportunity to participate in the environmental review process. . . . You are encouraged to become involved in this process and provide your specific comments or concerns about Millennium's proposal and the [Wagoner] alternative described above.")  In view of all of this, it seems clear that FERC duly considered the Wagoner Alternative (and other alternatives), and cogently explained its rationale in finding the Minisink Project properly approved under the NGA.  We would be hard-pressed to read the record otherwise.

In arguing to the contrary, Petitioners marshal only one meaningful theory in their favor.  They claim that the Commission's analysis was flawed because Millennium either planned or needed to upgrade the Neversink Segment all along.  In other words, according to Petitioners, even if Millennium moved forward with the Minisink Project (and not the Wagoner Alternative), it still had plans to replace the Neversink Segment in the very near future.  So the Commission's decision to account for the environmental impacts of a Neversink upgrade only in connection with the Wagoner Alternative and not the Minisink Project, Petitioners tell us, was unreasonable and misguided.  *E.g.*, Pet'rs' Br. at 32 ("Had the Commission compared a Minisink/Neversink project to a Wagoner/Neversink upgrade, the Wagoner alternative would have emerged as the superior choice.").  We reject their premise.

This argument effectively hinges on an ambiguous reference in one PowerPoint slide that Petitioners uncovered through an internet search in the midst of the agency proceedings—a document Petitioners generously refer to as

the "Currie Report."[6] This document, Petitioners surmise, proves that the construction of a new compressor station at Minisink was only Millennium's first step in a multi-phase expansion project, part of which was destined to include a Neversink upgrade all along. Notably, Petitioners made this very same argument to the Commission, and the Commission found it unsubstantiated. Rather, the Commission read the "Currie Report" as "merely . . . a marketing document," and found that, as a factual matter, it did not evince "an intent by Millennium to pursue an integrated, three-phase expansion of its system," nor "any firm decision by Millennium as to future construction," as had been suggested. *Reh'g Order*, ¶ 32 n.41. As to this factual determination, FERC's findings are "conclusive" if "supported by substantial evidence," 15 U.S.C. § 717r(b); *Colo. Interstate Gas Co. v. FERC*, 599 F.3d 698, 704 (D.C. Cir. 2010)—a standard, we have stated, that "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence," *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002). On this record, the Commission's finding falls comfortably within that range. We thus accept FERC's conclusion that the "Currie Report" does not establish any firm present or future plans by Millennium to upgrade the Neversink Segment.[7]

---

[6] Although never clearly explained, Petitioners seem to call this the "Currie Report" because they believe the PowerPoint presentation was prepared by an individual named Sean Currie, who is identified in at least one FERC filing as Millennium's Manager of Capacity Optimization. *See* J.A. 126 n.77.

[7] Petitioners say we should accord FERC's factual findings no deference because it was "biased" in favor of Millennium's application. *See* Pet'rs' Br. at 7, 41. In support, Petitioners point to an excerpted portion of FERC's Rehearing Order stating, in part, that "*there is no incentive for a project sponsor to present an application that cannot meet our standards for approval.*" Pet'rs'

In making this argument, Petitioners lean heavily on our decision in *City of Pittsburgh v. Federal Power Commission*, 237 F.2d 741 (D.C. Cir. 1956). But that decision cannot bear the weight Petitioners wish. In *City of Pittsburgh*, we reviewed the issuance of a certificate of public convenience and necessity allowing a natural gas supplier to abandon service on one pipeline and to transfer that load to another pipeline operating below capacity. In the course of contesting the Commission's order, a group of petitioners argued that the abandonment would result in rate increases associated with future expansions—increases that could be avoided, those petitioners said, if the supplier maintained service on the pipeline it sought to abandon. After review, this Court set aside the order, largely based on the Commission's failure to consider the effects of abandonment on the pipeline's future expansion. *Id.* at 750 ("[The Commission] persistently closed its eyes even to the existence of the problem of future expansion."). Seizing on that holding, Petitioners insist it

---

Br. at 7 (quoting *Reh'g Order*, at ¶ 45) (emphasis by Petitioners). We could see how these remarks might give Petitioners pause. After reading that applicants have "no incentive" to pursue proposals that cannot secure approval, it is conceivable that one might come away thinking the Commission has a thumb on the scale for industry applicants. This is hardly the image our federal regulators should be projecting to the American public. But as another recent decision from this Court explained in turning aside a similar argument, "[t]he fact that [applicants] generally succeed in choosing to expend their resources on applications that serve their own financial interests does not mean that an agency which recognizes merit in such applications is biased." *NO Gas Pipeline v. FERC*, No. 12-1470, slip op. at 10 (D.C. Cir. July 1, 2014). This logic holds true here, too. Though FERC's comments were arguably clumsy, it would require quite a leap on our part to equate its statements with prejudgment.

applies equally to the facts of their case because FERC glossed over and ignored the possibility of a future Neversink Segment replacement. For at least two reasons we can see, however, *City of Pittsburgh* finds no application here.

First, in *City of Pittsburgh*, it was clear and unmistakable that the pipeline intended to expand service in the future. *See id.* at 751 ("That Texas Eastern would soon move to expand its gas deliveries was apparent throughout the [Commission's] proceeding."); *id.* at 752 ("The record amply shows Texas Eastern's intention to apply for authority to expand its capacity and its sales."). Here, on the other hand, the Commission examined the record—including the so-called "Currie Report"—and found no concrete indication that Millennium intended, then or in the future, to upgrade the Neversink Segment. So the evidence of "future expansion" is a far cry from what we were presented with in *City of Pittsburgh*. Second, and perhaps more fundamentally, the shortcoming we took issue with in *City of Pittsburgh* was the Commission's refusal to examine the effects of future expansion *altogether*; the hearing examiner would not permit any questioning or inquiry into the supplier's plans for expansion, nor would the examiner consider several company memoranda that supposedly revealed such plans. *Id.* at 750-52. Here, in stark contrast, FERC unquestionably did consider Petitioners' theory that Millennium planned (or needed) to upgrade the Neversink Segment. *See Certificate Order*, ¶¶ 65, 68; *Reh'g Order*, ¶¶ 25, 32-33, 47, 73 & n.41. It just disagreed with their position that the prospect of such a step was sufficiently certain to require its environmental effects be taken into account in connection with the Minisink Project. Given this, we cannot say that the Commission "closed its eyes" to the issue of "future expansion"—here, the possible replacement of the Neversink Segment—as was the case in *City of Pittsburgh*. 237 F.2d at 750-52.

Given the foregoing, we have no basis to second-guess the Commission's determination that Millennium had no firm plans to upgrade the Neversink Segment in the wake of the Minisink Project. Petitioners also press this argument with a slightly different gloss, however. They argue that even if Millennium was not *planning* to replace the Neversink Segment, circumstances would soon *require* such a step nonetheless. Absent such an upgrade, Petitioners assert, a "bottleneck" caused by the smaller-diameter pipe on the Neversink Segment would preclude Millennium's pipeline from safely handling the volume, pressure, and speed that would be generated by the Minisink Project. (For the most part, this theory relies on the aforementioned study prepared by Mr. Kuprewicz.) We remain unmoved. The Commission considered this argument, too, and based on its assessment of the evidence, it again disagreed with Petitioners on the facts. FERC found no evidence that the Minisink Project would necessitate, as a structural or safety matter, an upgrade of the Neversink Segment. *See Certificate Order*, ¶ 68 ("Staff independently evaluated the hydraulic feasibility of the Minisink Compressor Station and completed an engineering analysis of Millennium's pipeline system . . . . [T]here is nothing in the record to suggest that the operation of the Minisink Compressor Station will compromise the safety of the Neversink Segment."); *see also Reh'g Order*, ¶¶ 75-80 (summarizing "flaws" in Mr. Kuprewicz's various suppositions, as viewed by FERC). As we explain shortly, the Commission's decision not to reopen the record to consider Mr. Kuprewicz's report was not an abuse of discretion, and Petitioners provide no other meaningful basis for concluding that FERC's factual determinations regarding the pipeline's structural integrity were unsupported by

substantial evidence. We thus find no basis to upset the Commission's finding on this point either.[8]

In our view, then, FERC reasonably concluded that the Wagoner Alternative would require replacement of the Neversink Segment, while the same was not plainly true of the Minisink Project. And with that factual determination in hand, it comes as no great shock that the Commission did not believe the Wagoner Alternative a better fit for the proposed project. On this point, some historical context is in order. More than a decade before the Minisink Project was proposed, Millennium had sought approval from FERC to construct a replacement pipeline for the original Neversink Segment. Initially, the Commission approved that proposal subject to certain conditions. *Millennium Pipeline Co., L.P.*, Interim Order, 97 FERC ¶ 61,292, at 62,356 (Dec. 19, 2001). But due to the extreme difficulty Millennium encountered trying to satisfy those conditions—including a host of environmental snags—it opted instead to rely on the existing 7.1-mile-long segment of pipe acquired from a competitor (Columbia Gas) for the Neversink River crossing, *i.e.*, the "Neversink Segment" as it exists today. *See* J.A. 401-05 (describing this background). FERC authorized that

---

[8] We also find it somewhat telling that neither of the dissenting commissioners expressed a belief that a Neversink upgrade was imminently inevitable. True, both thought a Neversink replacement would have yielded longer-term benefits that would have outweighed the positive environmental factors the majority associated with the Minisink Project (nearly all tied to avoiding, at least for the time being, a Neversink upgrade). And mostly for this reason, they believed the Wagoner Alternative preferable in the long run. But neither suggested that the record, as they saw it, showed that Millennium planned or needed to replace the Neversink Segment even if it did not pursue the Wagoner Alternative, as Petitioners maintain. *See* J.A. 41-47, 95-96, 106.

alternative arrangement in 2006. *See Millennium Pipeline Co., L.L.C.*, Order Issuing and Amending Certificates, Approving Abandonment, Vacating Certificate, and Granting and Denying Requests for Rehearing and Clarification, 117 FERC ¶ 61,319, at 62,576 (Dec. 21, 2006). Given Millennium's past struggles navigating the environmental complications of a Neversink upgrade, the fact that the Commission did not think such a course preferable at this juncture seems to us an understandable result.

In sum, as we have stated before, FERC "enjoys broad discretion to invoke its expertise in balancing competing interests and drawing administrative lines." *Am. Gas Ass'n*, 593 F.3d at 19 (citing *ExxonMobil Gas Mktg. Co.*, 297 F.3d at 1085); *see also Columbia Gas Transmission Corp. v. FERC*, 750 F.2d 105, 112 (D.C. Cir. 1984) ("[A]s an expert agency, the Commission is vested with wide discretion to balance competing equities against the backdrop of the public interest[.]"). Notwithstanding Petitioners' pleas to the contrary, we conclude that the Commission's consideration of the Wagoner Alternative falls within the bounds of that discretion.[9] Under our narrow standard of review, then, we

---

[9] We hasten to add that FERC's obligation to consider alternatives in Section 7 proceedings is not boundless. As we have previously explained, FERC need not "undertake exhausting inquiries, probing for every possible alternative, if no viable alternatives have been suggested by the parties, or suggest themselves to the agency." *Citizens for Allegan Cnty.*, 414 F.2d at 1133. We do not suggest otherwise today, nor must we venture beyond these general guideposts. Since the Wagoner Alternative was so fervently advocated for during the Minisink Project's review process, all agree that the Commission was obligated to at least consider it.

have no basis to upset the Commission's application of its Section 7 authority on this point.[10]

**B.**

Along with their weighty reliance on the Wagoner Alternative, Petitioners make several other arguments against the reasonableness of the Commission's analysis. We treat each argument in turn, finding none persuasive.

**1.**

Petitioners claim that the Commission failed to give the environmental impacts of the Minisink Project the "hard look" NEPA requires. We conclude otherwise.

NEPA's "hard look" doctrine is designed "to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Nat'l Comm. for the New River*, 373 F.3d at 1327. NEPA is a procedural statute; it "'does not mandate particular results, but simply prescribes the necessary

---

[10] On the other side of the "public benefits"/"adverse impacts" scale, Petitioners appear to separately argue that FERC violated its policy statement by relying on Millennium's existing contracts with gas transporters to demonstrate the public benefits of the Minisink Project. Pet'rs' Br. at 35. We reject that claim as well. Petitioners identify nothing in the policy statement or in any precedent construing it to suggest that it requires, rather than permits, the Commission to assess a project's benefits by looking beyond the market need reflected by the applicant's existing contracts with shippers. To the contrary, the policy statement specifically recognizes that such agreements "always will be important evidence of demand for a project." *Certificate Policy Statement*, 88 FERC ¶ 61,227, at 61,748.

process.'" *Midcoast Interstate Transmission*, 198 F.3d at 967 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). In reviewing an agency's compliance with NEPA, the "rule of reason applies," and we "consistently decline[] to 'flyspeck' an agency's environmental analysis." *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011) (quoting *Nevada v. U.S. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)).

Petitioners claim to eschew a flyspecking approach here, arguing instead that the Commission's analysis is laden with "gaping holes." Pet'rs' Br. at 41. They point to three. In our view, though, all fall decidedly more into the "flyspecking" camp than anything more.

*First*, Petitioners contend that the Commission erred in failing to undertake a more fulsome cost-benefit analysis of the Minisink Project as compared with the Wagoner Alternative. This argument essentially piggybacks off their overall Wagoner Alternative theory, and, in that sense, we reject it for the reasons already stated. In our view, the Commission reasonably assessed the Wagoner Alternative, particularly with respect to its environmental implications, as most concerns NEPA. *See Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 147 (D.C. Cir. 1985) ("NEPA's dual mission is . . . to generate federal attention to *environmental concerns* and to reveal that federal consideration for public scrutiny.") (emphasis added). Otherwise, to the extent Petitioners contend that the Commission should have focused more generally on the monetary costs and benefits of the respective proposals, we disagree that NEPA requires such an approach, particularly where only an environmental assessment, rather than an environment impact statement, is involved. *See Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 430 (4th Cir. 2012) ("The agency does not," under NEPA,

"need to display the weighing of the merits and drawbacks of the alternatives in a monetary cost-benefit analysis."); *Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 687 (D.C. Cir. 2004) ("[I]t is undisputed that the FAA was not required to undertake a formal cost-benefit analysis as part of the [environmental impact statement].").

*Second*, Petitioners argue that the Commission failed to examine the Minisink Project's impact on property values. But as the Commission rightly rejoins, the EA clearly addressed this issue. J.A. 457-58. It recognized there may be some adverse impacts on surrounding property values due to the compressor station. On balance, though, the EA concluded that "the recommended building design and landscaping plans would eventually minimize the visual impact from the station on the surrounding residential properties and would not significantly reduce property values or resale values." J.A. 458. The Commission's order echoes this general assessment. *Certificate Order*, ¶ 70 ("[W]e believe that the visual and noise mitigation measures recommended in the EA and included as conditions in this order, will mitigate the potential for decreases in property values."). Though we can see how Petitioners may disagree with this takeaway, their disagreement does not mean that FERC failed to consider the issue altogether, as they suggest.

*Third*, Petitioners claim that the Commission failed to assess cumulative and future impacts. They accuse FERC of ignoring two issues in particular: (1) Millennium's planned development of a second compressor station on the pipeline upstream from Minisink (what came to be the "Hancock Project"), and (2) the potential construction of a lateral pipeline from the Minisink compressor to a proposed power plant operated by CPV Valley LLC. The record belies this argument on both scores. As for the Hancock Project, the

EA's "Cumulative Impacts" discussion flags Millennium's "intent to construct a second compressor station" and explains that, because no certificate application had been filed with FERC, little was known about the details of the project. Nevertheless, given the "typical distances between compressor stations (70 miles) and the difference in construction timing," the EA stated that no significant cumulative impacts were expected, other than possibly with respect to air quality. J.A. 473. In view of the uncertainty surrounding the second compressor station, and the difference in timing between the two projects, this discussion suffices under NEPA.[11] The same holds true with respect to the

---

[11] We disagree with Petitioners that the EA's treatment of the "Hancock Project" contravenes this Court's decision in *Delaware Riverkeeper*, *see* Pet'rs' 28(j) Letter (June 16, 2014), which held that FERC improperly segmented and failed to consider the cumulative impacts of four "connected, contemporaneous, closely related, and interdependent" projects. *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1307 (D.C. Cir. 2014). In faulting the Commission's NEPA analysis of the cumulative impacts of the "Northeast Project" under review there, that decision took pains to emphasize that the other three projects were all "either under construction or were also pending before the Commission for environmental review and approval." *Id.* at 1308; *see also id.* ("FERC's NEPA review . . . did not consider any of the other upgrade projects, even though the first upgrade project was under construction during FERC's review . . . and even though the applications for the second and fourth upgrade projects were pending before FERC[.]"); *id.* at 1318 ("The temporal nexus here is clear. Tennessee Gas proposed the Northeast Project while the 300 Line Project was under construction . . . . [a]nd FERC's consideration of the Northeast Project application overlapped with its consideration of the remaining two projects . . . . We emphasize here the importance we place on the timing of the four improvement projects."). Those critical facts are worlds apart from this case. At the time of its application for the Minisink Project,

potential development of the CPV Valley power plant. The EA's "Cumulative Impacts" section identifies this possible project, too, though it again signals the absence of any firm details surrounding project specifics. Even still, the EA concluded that because the Minisink Project *itself* was expected to have minimal impacts, no significant *cumulative* impacts were expected to flow from the possible development of the CPV Valley power plant, particularly since the construction timelines for the two potential projects would be quite distinct. J.A. 473-74. In sum, based on our review of the EA, we are satisfied that FERC properly considered the cumulative impacts of the Minisink Project.

**2.**

Petitioners also assert that the Commission's approval of the Minisink Project contravenes its own siting guidelines. We can quickly dispatch these arguments.

Among its NEPA-implementing regulations, FERC has promulgated "[s]iting and maintenance requirements" for the construction and upkeep of facilities. 18 C.F.R. § 380.15. Petitioners think that the Minisink Project contravenes three separate provisions of that regulation. We think not. We first agree with the Commission that § 380.15(b) is inapplicable

---

Millennium had not yet applied for approval of the Hancock Project, nor was construction on either project underway. Furthermore, once plans for the Hancock Project were cemented and presented to FERC for approval under Section 7, the Commission did examine that project alongside the Minisink Project (then in the midst of development), and the resulting EA found no significant cumulative impacts associated with the two projects. *See Millennium Pipeline Co., L.L.C.*, Order Issuing Certificate, 145 FERC ¶ 61,007, at ¶ 52 (Oct. 1, 2013). For at least these reasons, *Delaware Riverkeeper* lends no help to Petitioners.

altogether because, by its terms, it is triggered only by facilities constructed on third-party landowners' property; here, as FERC noted below, *Reh'g Order*, ¶ 3, the Minisink Project was built on a parcel owned entirely by Millennium. While the parties also disagree whether § 380.15(e) (formerly § 380.15(d))[12] applies to a project involving the construction of a compressor station, we need not decide that issue because FERC nevertheless complied with the regulation's directive to consider the use or extension of existing rights-of-way. Indeed, the Commission explicitly recognized its policy of "encourag[ing] pipeline construction on existing right[s]-of-way as a means of minimizing environmental disturbance," but it concluded that any such preference does not alone provide a basis for rejecting an application that otherwise yields limited environmental impacts. *Reh'g Order*, ¶ 37.

This leaves only § 380.15(g) (formerly § 380.15(f)), which applies to the "[c]onstruction of aboveground facilities." On this point, Petitioners claim that the Minisink site is not "unobtrusive," but, in fleshing out that contention, they argue simply that the Wagoner Alternative would have been less so. We remain unconvinced by that approach. And otherwise, we agree with the Commission that it implemented appropriate mitigation measures to reduce the site's potential obtrusiveness. *See Reh'g Order*, ¶ 50 (summarizing Millennium's vegetation plans and noise mitigation requirements to reduce obtrusiveness); *id.* at ¶¶ 57-59 (outlining Commission's approval of building design and

---

[12] After the completion of briefing in these cases, FERC amended this regulation, adding a new subsection (c) and reconfiguring the existing provisions. As a consequence, the parties' briefs discuss §§ 380.15(d) and (f), which have since been re-designated as §§ 380.15(e) and (g), respectively. *See* 78 Fed. Reg. 72,794, 72,812-13 (Dec. 4, 2013). For clarity's sake, we refer to the regulation using its current numbering.

Millennium's agreement with Town of Minisink concerning landscaping and screening plan for site). Particularly in view of the deference owed FERC's interpretation of its own regulations, *see City of Oconto Falls, Wis. v. FERC*, 204 F.3d 1154, 1162 (D.C. Cir. 2000), we reject Petitioners' argument that the Minisink Project violates the siting guidelines.

## C.

As a final offensive, Petitioners attribute several procedural errors to the Commission's handling of Millennium's application for the Minisink Project. We take these arguments in turn, accepting none.

*First*, Petitioners declare that the Commission improperly refused to hold an evidentiary hearing on Millennium's application. "FERC's choice whether to hold an evidentiary hearing is generally discretionary." *Blumenthal v. FERC*, 613 F.3d 1142, 1144 (D.C. Cir. 2010). "In general, FERC must hold an evidentiary hearing only when a genuine issue of material fact exists, and even then, FERC need not conduct such a hearing if [the disputed issues] may be adequately resolved on the written record." *Cajun Elec. Power Coop., Inc. v. FERC*, 28 F.3d 173, 177 (D.C. Cir. 1994) (internal citations and quotation marks omitted) (alteration in original). We review the Commission's denial of a hearing request for abuse of discretion. *Woolen Mill Assocs. v. FERC*, 917 F.2d 589, 592 (D.C. Cir. 1990). Petitioners assert that a hearing would have resolved "several key factual disputes," but when push comes to shove, they point to only one—"the question of Millennium's intentions regarding the Neversink upgrade." Pet'rs' Br. at 53. Of course, the Commission did resolve that issue, it just did so on the written record, declining to interpret the "Currie Report" as the smoking-gun evidence Petitioners portrayed it to be, *Reh'g Order*, ¶ 32 n.41, and otherwise

finding that Millennium had no firm present or future intention to replace the Neversink Segment, *id.* ¶ 47. From FERC's perspective, there was no need to convene an evidentiary hearing to resolve this narrow issue. We perceive no abuse of discretion in that determination.[13]

*Second*, Petitioners complain that their due process rights were violated because the Commission failed to timely provide them with certain documentation during the proceedings—namely, particular hydraulic studies and engineering analyses that Millennium provided to FERC as part of its application. Petitioners concede, however, that MREPS and some of its individual members obtained these documents before the deadline to file for rehearing (indeed at least one petitioner who requested this information in March 2012 received access to it at least two months before petitions for rehearing were due). Oral Arg. Recording at 38:41-39:08; *see also Reh'g Order*, ¶¶ 70-71. There is no dispute, then,

---

[13] We note that, during the agency proceedings, Millennium represented that it had "no intention to file an application to replace the Neversink Segment before 2014." *Reh'g Order*, ¶ 47 (quoting "Millennium's December 9, 2011 Data Response No. 1," *reprinted at* J.A. 367-70). Given that we have since hit that 2014 marker, we asked Millennium's counsel at oral argument whether the company's intentions had changed. Counsel assured us they had not. We were told Millennium still had no present plans to replace the Neversink Segment. Although such an upgrade remains a possibility down the road if demand eventually dictates, counsel relayed, Millennium could and would look to other options as well. Oral Arg. Recording at 31:05-31:40, 34:30-34:39. Of course, our review is based on the record as it existed before the Commission at the time of its decision, *see CNG Transmission Corp. v. FERC*, 40 F.3d 1289, 1295 (D.C. Cir. 1994), but we would potentially be facing a more troublesome set of facts if Millennium now planned to pursue a Neversink upgrade after all. Because we take counsel at his word, we confront no such scenario here.

that Petitioners had the chance to make meaningful use of this information in connection with their petitions for rehearing. Under our precedent, this fact neutralizes any constitutional claim under the Due Process Clause. *See Blumenthal*, 613 F.3d at 1145-46; *see also Jepsen v. FERC*, 420 F. App'x 1, 2 (D.C. Cir. 2011) (per curiam). Relatedly, to the extent Petitioners assert that other potentially relevant documents were improperly withheld as confidential, the contention that such documents "'might' support [their] position [is] far too speculative to provide a basis for setting aside FERC's judgment," *B&J Oil*, 353 F.3d at 78, much less for finding a due process violation.

*Third*, Petitioners fault the Commission for failing to reopen the record to consider the "Kuprewicz Report." We review that decision "only for an abuse of discretion," *Cooley v. FERC*, 843 F.2d 1464, 1473 (D.C. Cir. 1988), and we find none here. Of course, FERC did *consider* the report, at least in a sense. True, the Commission declined to reopen the record and revisit its prior findings based on Mr. Kuprewicz's findings. But in the course of so concluding, the Commission undertook an analysis of his report and opinions. *Reh'g Order*, ¶¶ 75-80. In the end, the Commission believed his analysis "suffer[ed] from several flaws" and did not provide support for his position on many points, particularly where his assessment differed from that of FERC's staff. *Id.* ¶¶ 76, 79; *Second Reh'g Order*, ¶ 9. The Commission thus found that "Mr. Kuprewicz's study provides no basis for reversing [its] approval of the Minisink Project." *Reh'g Order*, ¶ 80. This decision strikes us as well within the bounds of FERC's discretion, particularly given the highly technical nature of the issues raised in the report. *See NRG Power Mktg., LLC v. FERC*, 718 F.3d 947, 962 (D.C. Cir. 2013). Consequently, we find no error in the Commission's declining to reopen the record based on Mr. Kuprewicz's report.

## III.

In approving the Minisink Project, the Commission accorded the Wagoner Alternative the serious consideration it was due, in keeping with its statutory obligations under the NGA and NEPA. In its judgment, the Commission did not think the Wagoner Alternative preferable and concluded that the Minisink Project, as put forward by Millennium, would serve the public interest and necessity. We are simply not empowered to second-guess the Commission's determination on this point or to substitute our judgment for the Commission's. Our much more limited role is, instead, to confirm that FERC thoroughly and reasonably examined the issue, and on the record before us, we are assured that it did.

For this and the other reasons we have explained, the petitions for review are denied.

*So ordered*.