# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 23, 2010　　　　Decided January 7, 2011

No. 09-1207

MURRAY ENERGY CORPORATION, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ROCKIES EXPRESS PIPELINE LLC, ET AL.,
INTERVENORS

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*R. Timothy McCrum* argued the cause for petitioners. With him on the briefs were *Jennifer N. Waters* and *J. Michael Klise*.

*Holly E. Cafer*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Thomas R. Sheets*, General Counsel, and *Robert H. Solomon*.

*J. Curtis Moffatt* argued the cause for intervenors. With him on the brief were *Amy W. Beizer*, *Shippen Howe*, *William F. Demarest Jr.*, and *Douglas F. John*.

Before: SENTELLE, *Chief Judge*; GRIFFITH, *Circuit Judge*; and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Rockies Express Pipeline LLC (REX) is a natural gas company that built and now operates the REX-East pipeline. The REX-East runs approximately 639 miles from Audrain County, Missouri, to Monroe County, Ohio, where it crosses land above the Century Mine, an underground longwall coal mine owned and operated by Murray Energy Corporation (Murray). Longwall mining causes the surface above to subside in a planned, controlled manner as coal seams are extracted. This subsidence places stress on pipelines that cross the mine area. Too much stress may rupture a pipeline and cause an explosion that would put at risk the safety of nearby persons and property. Concerned by the substantial hazard the REX-East pipeline poses to several hundred workers in the Century Mine, Murray petitions for review of two orders by the Federal Energy Regulatory Commission (FERC) authorizing its construction. For the reasons set forth below, we deny its petition.

I

The Natural Gas Act provides FERC with jurisdiction over the transportation and sale of natural gas in interstate commerce. *See* 15 U.S.C. § 717(b). Section 7(c) requires companies to obtain from FERC a "certificate of public convenience and necessity" before constructing or operating interstate natural gas facilities. *Id.* § 717f(c). FERC may

"attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." *Id.* § 717f(e).

REX filed an application for a section 7 certificate for the REX-East pipeline on April 30, 2007. In its submission, REX inaccurately stated that no active coal mines were located within one-half mile of the proposed route. FERC published notice of REX's application and issued a draft environmental impact statement (EIS). The draft EIS repeated REX's erroneous statement that the proposed route did not cross any active coal mines. Murray submitted late comments on the draft EIS, explaining that the pipeline would, in fact, cross approximately eight miles of coal deposits that Murray was either already mining or might mine in the future, and expressing concern that land subsidence might occur along these eight miles, placing dangerous levels of strain on the pipeline.

FERC granted REX's application on May 30, 2008, with a number of conditions ("Certificate Order"). *Rockies Express Pipeline LLC*, Order Issuing Certificate, 123 FERC ¶ 61,234 (2008). Most relevant to the current proceeding is condition 147:

> Prior to the start of construction [over the Century Mine], Rockies Express shall file with the Secretary [of the Commission], for review and written approval by the Director of OEP [Office of Energy Projects], a construction and operations plan, developed in collaboration with the Murray companies, for the segment of the pipeline that traverses the coal mining reserves held by the Murray Companies. The plan shall address the

primary concern of maintaining pipeline integrity and operation while not impeding the mining operation. If the collaboration does not culminate in a plan, Rockies Express shall file with the Secretary, for review and written approval by the Director of OEP, an alternative pipeline route that avoids the Murray Companies' coal reserves.

*Id.* app. E ¶ 147.

Over the next several months, REX and Murray exchanged numerous emails and telephone calls discussing the proposed pipeline. REX presented Murray with a draft construction and operations plan on November 25, 2008. Ten days later, REX met with Murray to review the draft plan. At the meeting, Murray expressed various concerns with the proposed pipeline, and REX made changes to the plan to address those concerns. Two weeks later, on December 23, REX filed its construction and operations plan with FERC. In the plan, REX explained that it would use thicker pipe, smaller pipeline depth, and a special trench design to mitigate subsidence effects, all in response to Murray's concerns. REX also indicated that it would develop a formal subsidence mitigation plan. REX included reports by Dr. D.J. Nyman and Dr. Syd Peng assessing the expected effect of mine subsidence on the proposed pipeline and a report by Robert Francini discussing options for mitigating mine subsidence.

On March 19, 2009, the Chief of Gas Branch 2 in OEP authorized construction of the pipeline ("Construction Order"), Rockies Express Pipeline LLC, Letter Order, Docket No. CP07-208-000 et al. (Mar. 19, 2009), stating expressly that approval was "in accordance with" numerous conditions in the Certificate Order, including Condition 147, *id.* Eight days later, Murray filed a request for rehearing of the

Construction Order, arguing that the Chief of Gas Branch 2 lacked authority to issue the order, that REX failed adequately to collaborate with Murray as Condition 147 required, and that REX's construction and operations plan was "deficient and unsafe" because it failed to protect Murray's mining operations.

On July 15, 2009, FERC granted rehearing in part ("Rehearing Order"). *Rockies Express Pipeline, LLC*, Order Granting and Denying Rehearing, 128 FERC ¶ 61,045 (2009). FERC affirmed the OEP Director's delegation of authority to the Chief of Gas Branch 2 and "adopt[ed] the Director's action, through his designee, as [FERC's] own." *Id.* ¶ 23. FERC also concluded that REX had satisfied Condition 147's collaboration requirement and was therefore not required to file an alternative route proposal. Finally, FERC determined that REX's construction and operations plan adequately protected the safety of the pipeline and Murray's mining operations. REX began construction of the pipeline over the Century Mine in May 2009 and completed construction in August 2009. Gas began flowing in November 2009.

Murray now petitions for review of the March 19, 2009, Construction Order and the July 15, 2009, Rehearing Order. We have jurisdiction under 15 U.S.C. § 717r(b), which permits any party to a proceeding under the Natural Gas Act "aggrieved by an order issued by the Commission in such proceeding" to obtain review of the order.

"We review FERC's orders under the arbitrary and capricious standard and uphold FERC's factual findings if supported by substantial evidence." *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 528 (D.C. Cir. 2010) (quoting *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010)) (internal quotation marks omitted); *see* 5 U.S.C. § 706(2); 15

U.S.C. § 717r(b). For its order to survive review, FERC must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Colo. Interstate Gas v. FERC*, 599 F.3d 698, 704 (D.C. Cir. 2010) (quoting *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004)) (internal quotation marks omitted).

At the outset, we note that Murray's complaints that the Construction Order ignored Murray's previous objections and failed adequately to explain the reasons for authorizing construction are beside the point. The Construction Order is not the only order under review. We also have before us the July 2009 Rehearing Order, which considered each of Murray's objections in detail and explained the problems with Murray's preferred alternative route. We consider whether in light of both orders FERC's conduct was arbitrary and capricious and its findings unsupported by substantial evidence.

## II

### A

We begin with Murray's delegation argument. Murray contends that the Chief of Gas Branch 2 lacked authority to issue the Construction Order under both FERC regulations and the Certificate Order itself. According to Murray, FERC regulations, per 18 C.F.R. § 375.308, permit the OEP Director to delegate authority only on "small bore" matters such as

"'uncontested' applications and requests, extensions of time to file, . . . reports for public information purposes that are of a noncontroversial nature, actions on routine requests, and the like." Pet'rs' Br. 42. The siting, construction, and operation of REX's pipeline, Murray argues, do not fit within this template. Murray further notes that even when the regulations permit the OEP Director to delegate authority to a "designee," the regulations specify that "*designee* shall mean the deputy of such official, the head of a division, or a comparable official as designated by the official to whom the direct delegation is made." 18 C.F.R. § 375.301(b). Murray asserts that the Chief of Gas Branch 2 is not "comparable to" the OEP Deputy Director or one of the division heads. Lastly, Murray says that the Certificate Order gives the OEP Director—"and no one else"—authority to certify REX's compliance with Condition 147. Pet'rs' Br. 41.

Whatever the merits of Murray's arguments here, they cannot succeed in light of a simple fact: the Commission ratified the Construction Order. In the Rehearing Order, the Commission expressly "affirm[ed] the practice of delegating authority to Commission staff" and "adopt[ed] the Director's action, through his designee, as [its] own." *Rockies Express Pipeline, LLC*, 128 FERC ¶ 61,045, ¶ 23. Given that the Commission had authority to issue the Construction Order, the Commission's subsequent ratification resolved any potential delegation problems. *See Dana Corp. v. ICC*, 703 F.2d 1297, 1301 (D.C. Cir. 1983) (rejecting argument that Acting Chairman lacked authority to issue stay order, because "even if there were serious problems of authorization involved, the full Commission, by upholding the Acting Chairman's stay, ratified his action and made it its own").

8

B

Murray argues next that FERC should not have approved construction of the pipeline because REX had not fulfilled Condition 147, which requires REX to "develop[] in collaboration with [Murray]" a construction plan that maintains "pipeline integrity and operation" without impeding Murray's mining activities. *Rockies Express Pipeline LLC*, 123 FERC ¶ 61,234 app. E ¶ 147. Condition 147 further provides that if the collaboration between REX and Murray "does not culminate in a plan," REX must file an alternative route that avoids Murray's coal reserves. *Id.* According to Murray, REX did not collaborate. Rather, REX simply pressed forward with its plan, rejecting all alternatives offered by Murray. Under these circumstances, Murray argues, Condition 147 required REX to file an alternative route that avoided the Century Mine altogether.

But Murray conceded in its briefs and at oral argument that Condition 147 did not require REX to obtain Murray's consent before construction could proceed. *See* Oral Arg. Tr. at 7 ("[W]e have made it clear in our briefs that we have not contended we have a veto . . . ."); Reply Br. 17 ("[T]hroughout these proceedings Murray has never stood back and insisted on a simple veto power."). And if Condition 147 did not require consensus, it seems clear to us that REX satisfied whatever collaboration requirement existed.[1]

---

[1] Murray's concession also makes it unnecessary to consider the import of FERC's statement in the November 10, 2008, Clarification Order, *Rockies Express Pipeline LLC*, Order Granting and Denying Requests for Clarification and Denying Request for Reconsideration, 125 FERC ¶ 61,160 (2008), that FERC might require an alternative route if REX and Murray could not "agree" on a suitable construction plan, *id.* ¶ 20.

The record reveals numerous communications between REX and Murray between the date FERC issued the Certificate Order and the date REX filed its construction plan. As the Rehearing Order observes, REX and Murray had numerous telephone calls and email exchanges during this period, and the two parties met face-to-face on December 5, 2008, to discuss a draft construction plan. The plan REX submitted addressed methods for maintaining pipeline integrity while not impeding mining operations. Absent evidence of bad faith on REX's part, and Murray has shown none, we are reluctant to read "collaboration" as requiring anything more than what REX did. FERC reasonably concluded on the basis of substantial evidence that REX satisfied Condition 147's requirement of collaboration.

C

Finally, Murray claims that REX's construction plan failed to ensure the safety of the pipeline for four reasons: (1) REX's experts lacked adequate qualifications; (2) REX's experts suggested the plan was unsafe; (3) the special trench design was untested; and (4) the plan did not bind REX to any actual protective measures. We take up each argument in turn and conclude that each fails. FERC's judgment that REX's proposed measures adequately ensure the pipeline's safety is supported by substantial record evidence, and FERC offered satisfactory explanations for its conclusions.

Murray's protest that none of REX's proffered experts is "a registered professional engineer in Ohio," Pet'rs' Br. 48, is true, but beside the point. Dr. Nyman holds a Ph.D. in structural engineering and has 35 years of experience in structural engineering, stress analysis, and failure investigations. His resume indicates extensive work on pipeline safety. Dr. Peng is the Chair of the Mining Engineering Department at West Virginia University, and was

in fact recommended to REX by Murray. Francini has twenty years' experience analyzing subsidence effects on pipelines. FERC reasonably concluded that REX's experts were creditable.

Murray also contends that REX's experts actually undercut FERC's conclusion that REX's construction plan ensures the pipeline's safety. Although it is true that some of the experts' statements contradict discrete elements of FERC's position, on the whole their reports support FERC's conclusion. Murray's argument here rests on three grounds. First, in both his June 2007 and January 2009 reports, Dr. Nyman stated that pipelines should be routed "where feasible" to avoid longwall mining activity. D.J. Nyman & Assocs., Engineering Assessment of Coal Mining Subsidence Effects on Rockies Express Pipeline 1 (June 26, 2007); D.J. Nyman & Assocs., Engineering Assessment of Rockies Express Pipeline Subjected to Expected Ground Subsidence Over Long Wall Panels at Century Mine 1 (Jan. 15, 2009) [hereinafter 2009 Nyman Report]. Second, Dr. Peng concluded in his December 2008 report that certain portions of the pipeline over the Century Mine "may be severely overstressed and potentially damaged" during mine subsidence. Syd S. Peng & Thomas Du, Assessment of Subsidence Influence on Proposed Rockies Express Pipelines Due to Longwall Mining 67 (Dec. 18, 2008). Third, Dr. Nyman and Dr. Peng both warned that steep terrain carries a higher risk of landslides. Much of the terrain over the Century Mine is relatively steep.

As to Dr. Nyman's recommendation that pipelines should *generally* be routed to avoid longwall mining, he said nothing about rerouting REX's pipeline *in particular*. In fact, in his 2009 report, which examined "representative" subsidence patterns in the Century Mine area, Dr. Nyman concluded that the estimated "pipeline stresses resulting from subsidence

associated with longwall mining [were] well within acceptance criteria." 2009 Nyman Report, *supra*, at 15. Notably, Dr. Nyman incorporated into his analysis REX's planned construction mitigation measures, including thicker pipe, gentler bends, a special trench design with slanted rather than vertical walls, and granular backfill.

As to Dr. Peng's conclusion that subsidence *would* overstress the pipeline, two points bear emphasis. First, Dr. Peng's analysis assumed a ruler-straight route over the mining area rather than the actual undulating route REX proposed. Second, the only construction mitigation measure that Dr. Peng included in his analysis was the use of thicker pipe. Dr. Peng did not consider the use of the other mitigation measures REX adopted: gentler bends, REX's special trench design, and granular backfill. The failure to account for these measures limits the predictive value of Dr. Peng's study.

Regarding Dr. Nyman's and Dr. Peng's warnings that steep terrain carries a higher risk of landslides, REX stated in an explanatory filing that the pipeline route "generally follows ridge tops" and that "[w]here the proposed route descends and ascends into and out of stream valleys, it parallels the fall-line of the valley slopes." Rockies Express Pipeline LLC, Explanatory Statement of Rockies Express Pipeline LLC Regarding Its Construction and Operations Plan 5, Docket No. CP07-208-000 et al. (Dec. 23, 2008). We find this statement sufficient to allay concerns about steep terrain in the pipeline area.

As a whole, the expert reports establish that substantial evidence supports FERC's conclusion that REX's plan will adequately ensure pipeline safety. Dr. Nyman concluded that the pipeline would not suffer overstress, and Francini was unable to identify a single instance of pipeline failure related to subsidence where mitigation measures such as exposing

and monitoring the pipeline—measures REX intended to take if needed—had been performed. Murray also submitted two reports by WEIR International, Inc., a mining consulting firm, contending that the proposed routing was unsafe. As REX notes, however, WEIR has "no noted experience in the design of pipelines, pipe stress analysis, or pipe structural safety," Interv'rs' Br. 12, and the resumes of the authors of the WEIR report contain no reference to any previous pipeline work (although the resumes do identify previous subsidence work). In any event, we defer to FERC's "resolution of factual disputes between expert witnesses." *Elec. Consumers Res. Council v. FERC*, 407 F.3d 1232, 1236 (D.C. Cir. 2005). FERC chose to credit Dr. Nyman's conclusions rather than those of Dr. Peng and WEIR. That decision was a reasonable one.

Murray additionally claims that REX's special trench design, which employs slanted rather than vertical walls, was "novel" and "literally a work in progress" and "had never been put to any prior use to mitigate mining subsidence." Pet'rs' Br. 51-52. Murray's argument fails for two reasons. First, as REX noted to the Commission, "these types of designs have been used for at least 25 years to enable pipelines to withstand geotechnical displacements that are much more severe than those predicted for the mine subsidence area." Rockies Express Pipeline LLC, Responses to Commission Staff Questions from the February 17, 2009, Technical Conference 7, Docket No. CP07-208-000 et al. (Feb. 23, 2009). Second, and more importantly, Dr. Nyman implicitly endorsed the design in his 2009 report, finding that it carries benefits for horizontal bends that exceed twenty degrees. FERC's decision to approve REX's trench design was neither arbitrary nor capricious.

Finally, Murray faults FERC for approving a construction plan that did not bind REX to any mandatory post-

construction mitigation measures. Murray's argument here has two prongs. First, Murray contends that REX's construction plan does not actually require REX to follow the post-construction mitigation measures specifically identified in the construction plan. Second, Murray contends that FERC unlawfully disregarded the Department of Transportation Pipeline and Hazardous Materials Safety Administration's (PHMSA's) project-specific mitigation requirements in violation of FERC's duty to "respect" the views of an agency "more directly responsible and more competent than this Commission" in matters of pipeline safety. Pet'rs' Br. 57; *see City of Pittsburgh v. Fed. Power Comm'n*, 237 F.2d 741, 754 (D.C. Cir. 1956) (explaining that the Commission "would . . . do well to respect the views of . . . other agencies as to those problems" for which those other agencies "are more directly responsible and more competent than this Commission"). A review of the record, however, shows that FERC's approval of REX's plan was not arbitrary and capricious.

Murray strains the language of the construction plan to fashion its argument that REX is free to disregard the plan's post-construction mitigation measures. The plan provides that Murray will "[d]evelop a formal mitigation plan" that "may include," among other things, "recommended steps to take prior to the subsidence,"[2] "[a] multi-level monitoring criterion," and "[r]ecommendations for post-subsidence mitigation, if required." Rockies Express Pipeline LLC, Construction and Operations Plan of Rockies Express Pipeline LLC Pursuant to Environmental Condition No. 147,

---

[2] The construction plan further specifies that these steps "may include": monitoring subsidence without exposing the pipeline or taking it out of service, exposing the pipeline during subsidence but leaving it in service, decreasing the pipeline's operating pressure during subsidence, or taking the pipeline out of service during subsidence.

at 16-17, Docket No. CP07-208-000 et al. (Dec. 23, 2008) (emphasis omitted).

As Murray reads this language, REX is not bound to "*any* actual mandatory protective measures." Pet'rs' Br. 52 (emphasis added). But no reasonable reading of this language can overlook the obvious: the construction plan contemplates a mitigation plan. To be sure, the precise contours of the mitigation plan are to be worked out later when it becomes apparent what measures are needed, but there will be a plan. Absent evidence to the contrary, we assume, as did FERC, that REX will exercise good faith in developing this plan. REX's post-construction mitigation strategy is a reasonable response to the commonsense notion that, as the Commission explains, REX will be "better able to fully evaluate the site-specific effects of subsidence on the pipeline" *after* "Murray finalizes mining maps for its reserves." *Rockies Express Pipeline, LLC*, 128 FERC ¶ 61,045, ¶ 42.

On the second point, Murray is simply wrong that FERC disregarded PHMSA's project-specific mitigation requirements. These "requirements" come from an email PHMSA sent the Chief of Gas Branch 2 in response to the Chief's request for assistance in reviewing REX's proposed construction plan. Attached to the email was a document titled "Operational Mining Plan Requirements for Mining Subsidence Safety: Rockies Express Pipeline (REX)." Rockies Express Pipeline LLC, Memorandum to Public File, Docket No. CP07-208-000 et al. (June 3, 2009). The document contained the following relevant language: "The operational mining procedures must contain as a minimum the following provisions: . . . 4.b. Excavate the pipeline prior to longwall mining begins [*sic*]; . . . monitor during mining and subsidence; and remediate during and after subsidence all pipe segments in the longwall mining sections." *Id.* It is true that the Rehearing Order does not specifically require REX to

heed these provisions. Murray, however, overlooks REX's June 12, 2009, filing, which states: "[S]ince the issuance of the [PHMSA email], various communications between [REX] and PHMSA have confirmed Commission staff's understanding that the PHMSA Guidelines [in the email] are in fact guidelines rather than absolute requirements." Rockies Express Pipeline LLC, Letter from J. Curtis Moffatt, Attorney for Rockies Express Pipeline LLC, to Alisa M. Lykens, Chief of Gas Branch 2, Office of Energy Projects, Docket No. CP07-208-000 et al. (June 12, 2009). Murray neither disputes the truth of this statement nor attempts to explain why FERC should have required compliance with instructions that PHMSA itself acknowledged were not mandatory.

In any event, Murray's argument that FERC failed sufficiently to "respect" PHMSA's views is implausible in light of the multiple times FERC says in the Rehearing Order that REX must comply with any measures that PHMSA *does* in fact require. *See, e.g.*, *Rockies Express Pipeline, LLC*, 128 FERC ¶ 61,045, ¶ 12 ("[REX] must comply with any provisions deemed necessary by PHMSA.");[3] *id.* ¶ 42 ("[REX] is required to comply with PHMSA regulations to ensure the safety of the pipeline should subsidence of the ground beneath the pipeline occur."); *id.* ¶ 55 ("We again emphasize that the requirements in the Construction and Operations Plan are in addition to what PHMSA may require."). FERC's repeated declarations that REX must comply with PHMSA requirements indicate that FERC took seriously—and addressed—the need for post-construction

---

[3] This statement itself cures any defect from FERC's failure explicitly to require REX to follow PHMSA's project-specific "requirements." If the project-specific "requirements" were in fact requirements, then they were clearly "deemed necessary" by PHMSA.

mitigation measures.[4] FERC's decision not to require specific post-construction mitigation procedures was not arbitrary and capricious.

## III

For the foregoing reasons, the petition for review is

*Denied.*

---

[4] Murray argues that FERC's explicit command that REX comply with PHMSA requirements is irrelevant because PHMSA does not regulate Murray and therefore will not know when Murray is about to subside the pipeline. This is a puzzling argument, however, for it seems to presuppose that REX *also* will not know when Murray is about to subside the pipeline. PHMSA may not regulate Murray, but it does regulate REX. Thus, once Murray tells REX that Murray is preparing to subside the pipeline, REX will be required to follow PHMSA procedures. Only if Murray intends to subside the pipeline without telling REX is the fact that REX must comply with PHMSA requirements irrelevant. Presumably, however, Murray *will* tell REX when it plans to subside the pipeline, at least so long as Murray continues to fear that a pipeline rupture may impede its mining operations.