# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 19, 2017          Decided July 27, 2018

No. 16-1081

CITY OF BOSTON DELEGATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ALGONQUIN GAS TRANSMISSION, LLC, ET AL.,
INTERVENORS

———

Consolidated with 16-1098, 16-1103

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Thomas S. Fitzpatrick* argued the cause for petitioner City of Boston Delegation. With him on the briefs was *Joshua S. Grossman.*

*Carolyn Elefant* argued the cause for petitioners Riverkeeper, Inc., et al. With her on the briefs were *Jeffrey M. Bernstein*, *Rebecca F. Zachas*, and *Alexander English.*

*Ross R. Fulton*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the briefs were *James P. Danly*, General Counsel, *Robert H. Solomon*, Solicitor, and *Holly E. Cafer*, Senior Attorney.

*Jeremy C. Marwell* argued the cause for intervenor Algonquin Gas Transmission, LLC, et al. With him on the briefs were *Anita R. Wilson*, *Michael B. Wigmore*, *Andrew N. Beach*, and *Steven E. Hellman*.

Before: HENDERSON and SRINIVASAN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: In March 2015, the Federal Energy Regulatory Commission approved an application from Algonquin Gas Transmission, LLC, to undertake an upgrade to its natural gas pipeline system. The $972 million project would enable Algonquin to meet some of the increasing demand for natural gas in New England and reduce pricing volatility in the region.

A number of parties now seek to challenge the Commission's approval of Algonquin's project. They allege, among other things, that the Commission erred in assessing the project's environmental impacts, unreasonably relied on expert opinions concerning the project's safety, and failed to recognize the bias of a third-party contractor. At the outset, we dismiss one party's petition for review for want of standing. We deny the remaining petitions for review on the merits.

3

I.

A.

The Natural Gas Act grants the Federal Energy Regulatory Commission authority to regulate the interstate transportation of natural gas. 15 U.S.C. §§ 717b, 717c. To construct or operate an interstate natural gas pipeline, a company must obtain "a certificate of public convenience and necessity," 15 U.S.C. § 717f(c), known as a Section 7 certificate. The Commission will grant a Section 7 certificate "only if the public benefits from the project outweigh any adverse effects." Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC ¶ 61,227, at 61,750 (Sept. 15, 1999), *clarified*, 90 FERC ¶ 61,128, at 61,396-98 (Feb. 9, 2000), *further clarified*, 92 FERC ¶ 61,094, at 61,373-75 (July 28, 2000).

As part of the process of issuing a Section 7 certificate, the Commission must satisfy the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* NEPA establishes an environmental review process under which federal agencies "identify the reasonable alternatives to [a] contemplated action and look hard at the environmental effects of their decisions." *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 102 (D.C. Cir. 2014) (alterations and internal quotation marks omitted). In the case of "major Federal actions significantly affecting the quality of the human environment," NEPA calls for the relevant federal agency to prepare "a detailed" environmental impact statement. 42 U.S.C. § 4332(2)(C).

B.

Algonquin Gas Transmission, LLC, operates a natural gas pipeline system that starts in New Jersey, runs north through

New York, Connecticut, and Rhode Island, and ends in Massachusetts. In light of increasing demand for natural gas in the New England area, Algonquin planned several discrete projects to increase the capacity of its pipeline system. One of those projects, the Algonquin Incremental Market Project (AIM Project), is the subject of the petitions for review we consider in this case.

In February 2014, Algonquin applied to the Commission for authorization to construct the AIM Project. The proposal sought to replace 29.2 miles of existing pipeline with larger diameter pipe, construct 8.2 miles of new pipeline, build three new meter stations, and modify various other compressor and meter stations.

Of particular relevance, the AIM project included a proposal to construct roughly five miles of new pipeline known as the West Roxbury Lateral, which would run adjacent to an active quarry outside of Boston. The project also sought to install larger-diameter replacement pipeline next to the Indian Point Energy Center, a nuclear facility in Westchester County, New York. Overall, the AIM Project would give Algonquin an additional 342,000 dekatherms per day of natural gas transport capacity from Ramapo, New York, to various cities in Connecticut, Rhode Island, and Massachusetts.

In addition to the AIM Project, Algonquin is pursuing two other upgrades to its northeast pipeline system. Those ventures are known as the Atlantic Bridge Project and the Access Northeast Project. In the Atlantic Bridge Project, Algonquin seeks to create 132,705 dekatherms per day of capacity from New Jersey and New York to various points on its system, by replacing several miles of pipeline with larger-diameter pipes and constructing or modifying a number of compressor and meter stations. Algonquin applied for a Section 7 certificate

for Atlantic Bridge in October 2015, and the Commission granted the certificate in January 2017. Order Issuing Certificate, *Algonquin Gas Transmission, LLC*, 158 FERC ¶ 61,061 (Jan. 25, 2017) (Atlantic Bridge Certificate Order). In the Access Northeast Project, Algonquin planned to install pipeline and modify facilities in order to provide natural gas to electric power plants in New England. Pre-filing review for the Access Northeast Project began in November 2015, but Algonquin withdrew the pre-filing application in June 2017.

On January 23, 2015, the Commission issued its final environmental impact statement under NEPA for the AIM Project. On March 3, 2015, after receiving comments on the environmental impact statement, the Commission issued an order granting Algonquin a Section 7 certificate to construct and operate the AIM Project. Order Issuing Certificate, *Algonquin Gas Transmission, LLC*, 150 FERC ¶ 61,163 (Mar. 3, 2015).

Several parties in the agency proceedings, including the petitioners in this case, requested rehearing before the Commission. The City of Boston Delegation alleged that the Commission failed to give adequate consideration to the safety risks of running the West Roxbury Lateral adjacent to an active quarry. The Town of Dedham, Massachusetts, and Riverkeeper, Inc., argued in part that the Commission impermissibly segmented its NEPA review by failing to consider Algonquin's three planned projects together in a single environmental impact statement. Additionally, a coalition of environmental groups, community organizations, and individuals alleged, among other claims, that the Commission insufficiently examined the cumulative impact of the Atlantic Bridge and Access Northeast projects, and failed adequately to consider safety issues raised by the pipeline's proximity to the Indian Point nuclear facility.

The Commission denied the parties' requests for rehearing and dismissed their requests for a stay. Order Denying Rehearing, *Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048 (Jan. 28, 2016) (Rehearing Order). A number of parties now seek review in this court of the Commission's grant of a Section 7 certificate for the AIM Project.

In particular, we consider three petitions for review, brought by (i) the City of Boston Delegation; (ii) the Town of Dedham, Massachusetts; and (iii) Riverkeeper, Inc., along with a coalition of environmental groups, community organizations, and individuals. The Delegation, in its own briefing, raises challenges focused on the West Roxbury Lateral. The Town of Dedham, together with Riverkeeper, Inc., and the coalition, jointly present a separate set of arguments addressing, among other things, the cumulative environmental impacts of Algonquin's three projects and the safety concerns raised by the AIM Project's proximity to the Indian Point nuclear facility. Algonquin, as intervenor, has submitted a brief supporting the Commission.

## II.

Before reaching the merits of petitioners' claims, we must first examine their standing to sue. Although the Commission did not initially contest the petitioners' standing, Algonquin raised the issue as intervenor. And because we have an independent obligation to assure ourselves of our jurisdiction, we asked for supplemental briefing addressing the question of standing.

To establish standing under Article III of the Constitution, petitioners must demonstrate (i) an injury in fact, (ii) that is fairly traceable to the challenged conduct, and (iii) that is likely to be redressed by a favorable decision. *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560-61 (1992). We hold that the City of Boston Delegation lacks standing because it has failed to demonstrate an injury in fact. We therefore dismiss the Delegation's petition for review for lack of jurisdiction without reaching the merits of the Delegation's arguments. We conclude that the remaining petitioners have adequately demonstrated standing and thus reach the merits of their petitions.

A.

The City of Boston Delegation consists of nine elected representatives from Boston, including the Mayor, a congressman, five city councilors, a state senator, and a state representative. The Delegation's claim of injury for standing purposes rests on the West Roxbury Lateral's allegedly adverse safety, health, and environmental effects on the City. The Delegation stakes its standing primarily on the Mayor's participation in the petition. The Delegation's theory is that, because the Mayor regularly initiates litigation on behalf of the City, the Mayor's involvement in the petition effectively makes the City of Boston a party. As a result, the Delegation asserts, the harms to the City caused by the pipeline can supply the requisite injury in fact for purposes of establishing the Delegation's standing. We are unpersuaded by the Delegation's theory.

While the City of Boston could in theory bring an action, the Mayor does not act as the City when he files a lawsuit in his own name. Under Massachusetts law, the City of Boston "may in its corporate capacity sue and be sued by its name." Mass. Gen. Laws ch. 40, § 2 (2018). And in practice, the City does in fact sue in its own name. *See, e.g.*, *City of Boston v. Boston Police Superior Officers Fed'n*, 993 N.E.2d 693 (Mass. 2013). The city code specifies the process by which a lawsuit

is initiated on behalf of the City of Boston: the City's Corporation Counsel "shall, subject to the direction of the Mayor, institute any suit or proceeding in behalf of the City which he shall deem the interest of the City requires." City of Boston Mun. Code, Ordinance § 5-8.1. That process did not take place here.

The Delegation reads the ordinance to encompass any lawsuit determined by the *Mayor* to be in the City's interest, thus affording the Mayor discretion to sue on behalf of the City. The ordinance, though, does not support that reading. Rather, the ordinance requires the *Corporation Counsel* to institute suit (subject to the Mayor's direction), and in doing so, the *Corporation Counsel* must "deem the interest of the City requires" bringing the litigation.

There is no indication here that the Mayor directed the Corporation Counsel to file this petition, or that the Corporation Counsel made the requisite determination that "the interest of the City require[d]" seeking review of the Commission's order. The ordinance's procedure for initiating suit on behalf of the City thus was not followed. And the Mayor, per the terms of the ordinance, does not inherently litigate on behalf of the City whenever he appears in his own name, at least without the necessary determination by the Corporation Counsel. We are not at liberty to disregard the city code's prescribed process by which an action is brought in the City's name. We therefore cannot treat the City as a de facto petitioner merely by virtue of the Mayor's participation.

The Delegation has pointed us to no cases supporting a contrary conclusion. For instance, the Delegation cites *RicMer Properties v. Board of Health of Revere*, 794 N.E.2d 1236 (Mass. 2003), for the proposition a municipality in Massachusetts can represent "the public interest" by asserting

parens patriae standing on behalf of the municipality's residents. *Id.* at 1240. *RicMer* does not help the Delegation. There, the mayor and city council abided by the ordinary process of directing the corporation counsel to intervene on behalf of the city, and the city itself intervened. *Id.* at 1238 & n.2. The other cases referenced by the Delegation likewise do not support the proposition that a mayor, in her own name, can assert a city's parens patriae interest even if the city itself is not a party: those cases involved actions brought by a municipality itself. *See Town of Sudbury v. Dep't of Pub. Utils.*, 218 N.E.2d 415, 419 (Mass. 1966) (towns have standing to "represent the public interest"); *Town of Wilmington v. Dep't of Pub. Utils.*, 165 N.E.2d 99, 103 (Mass. 1960) (same).

Here, by contrast, the Mayor is a member of the Delegation in his own name, and the process for bringing suit in the name of the City through Corporation Counsel was not followed. In these circumstances, we cannot conclude that the Delegation, purely by virtue of the Mayor's participation, is acting on behalf of the City in pursuing the petition for review. It follows that the Delegation cannot assert injuries to the City itself (or assert the City's parens patriae interest in its residents) as the basis of the Delegation's standing. *See Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 193 (3d Cir. 2016). And because the City itself is not a party, we have no occasion to consider whether the City, if it were a party, could establish standing based on a parens patriae theory. *Cf. City of Olmstead v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002) (declining to decide whether a municipality can "sue the federal government under the doctrine of *parens patriae*"); *Md. People's Counsel v. FERC*, 760 F.2d 318, 321-22 (D.C. Cir. 1985) (state agency has parens patriae standing to challenge Commission orders in federal court).

Because the Delegation is not petitioning as the City of Boston, it can establish standing only by demonstrating that its individual members suffer an injury in fact from the pipeline project. The Delegation's attempts to do so in passing, by briefly asserting that certain of its members individually have standing, are inadequate. For instance, the Delegation observes, without any elaboration, that two of its members reside in the West Roxbury neighborhood and that the Mayor has an interest in the neighborhood's safety as the city's chief executive. Those "[b]are allegations" are insufficient to demonstrate a "substantial probability" that the Delegation has sustained an injury in fact sufficient to confer standing. *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002). And because the Delegation has not established that it has standing to seek review of the Commission's decision, we must dismiss the Delegation's petition for review for lack of jurisdiction.

B.

Unlike the Delegation, the remaining petitioners—the Town of Dedham, Riverkeepers, Inc., and the various coalition members—have established Article III standing to bring their petitions for review. Generally, petitioners must "demonstrate standing for each claim [they] seek[] to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). But when multiple petitioners bring claims jointly, only one petitioner needs standing to raise each claim. *Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009). In addition, for this court to have jurisdiction under the Natural Gas Act to consider an issue, the party seeking review must have presented the same issue to the Commission in an application for rehearing. 15 U.S.C. § 717r(b).

As part of the AIM Project, Algonquin installed new pipeline through the Town of Dedham, Massachusetts, running

the pipeline underneath town roads and a town-owned park. The Town alleges that the pipeline has caused significant construction-related harm from increased traffic, noise, and disruption of businesses. The Town further notes that the project would require "future, inconvenient re-opening of the Town roads" to maintain the pipeline, which would again visit the same injuries on the Town. Riverkeeper Opening Br. 9. Under our precedents, that kind of injury to the property interests of a landowner whose land is transected by a natural gas pipeline constitutes a sufficient injury in fact to substantiate standing. *Sierra Club v. FERC*, 867 F.3d 1357, 1366 n.2 (D.C. Cir. 2017); *see id.* at 1366; *Minisink*, 762 F.3d at 106.

The Town also alleges that the operation of the pipeline through its property "poses an ongoing safety risk" that will affect the Town financially. Riverkeeper Opening Br. 9. We have held that the presence of a "continuing safety hazard" caused by the nearby installation of a natural gas pipeline can establish an injury in fact. *Moreau v. FERC*, 982 F.2d 556, 565 (D.C. Cir. 1993); *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1317 (D.C. Cir. 2015). And considered in the context of the financial harm alleged by the Town and the infringement of its property interests, the safety risk further demonstrates an injury in fact for purposes of standing.

Beyond the Town, Reynolds Hills, Inc.—a member of the coalition seeking review—has demonstrated its standing so as to enable our consideration of petitioners' remaining arguments. Reynolds Hills is a non-profit neighborhood community in Westchester County, New York. As with the Town, the AIM Project involved construction of a pipeline upgrade across Reynolds Hills's property. Reynolds Hills adequately alleged an injury to its property interests and the aesthetic interests of its members caused by the project. It also adequately alleged an increased safety risk from the upgraded

pipeline on its property and from the project's alleged effects on the Indian Point nuclear facility. Those allegations of harm from the project—which we assume are true for purposes of standing, *see Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007)—demonstrate that Reynolds Hills has suffered an injury in fact.

In addition to establishing injury in fact, the Town and Reynolds Hills also satisfy the second and third requirements of standing. Their injuries are fairly traceable to the construction and operation of the pipeline as approved by the Commission's certificate order, and the injuries would be redressed by vacatur of that order on any ground. *See Sierra Club*, 867 F.3d at 1366.

Finally, between the Town and Reynolds Hills, they exhausted before the Commission all the issues raised collectively in the joint petitioners' brief (except a conflict-of-interest claim we discuss below, Part III.C). In the Town's application for rehearing to the Commission, the Town argued that the Commission improperly segmented its environmental review by failing to consider Algonquin's three projects together. Meanwhile, Reynolds Hills argued on rehearing that the Commission inadequately assessed the cumulative environmental impacts of Algonquin's three projects, and failed to give proper consideration to the safety concerns arising from the project's effects on the Indian Point nuclear facility. We therefore have jurisdiction to address the merits of the arguments raised in the petitions brought by the Town, Riverkeeper, and the coalition.

III.

We review the Commission's grant of a Section 7 certificate "under the familiar arbitrary and capricious

standard," bearing in mind that "the grant or denial of" such a certificate "is a matter peculiarly within the discretion of the Commission." *Minisink*, 762 F.3d at 105-06 (brackets and citation omitted). Applying that standard, we sustain the Commission's order against the challenges brought jointly by the Town, Riverkeeper, and the coalition.

A.

In the first set of arguments raised by petitioners, they contend that the Commission failed to comply with NEPA in approving the AIM Project. NEPA generally obligates agencies to take a "'hard look' at the environmental impacts of a proposed action." *Myersville*, 783 F.3d at 1324. An environmental impact statement is "deficient, and the agency action it undergirds is arbitrary and capricious, if the EIS does not contain sufficient discussion of the relevant issues and opposing viewpoints, or if it does not demonstrate reasoned decisionmaking." *Sierra Club*, 867 F.3d at 1368 (internal quotation marks and citations omitted). In evaluating an agency's NEPA analysis, we apply a "rule of reason," and have "refused to 'flyspeck' the agency's findings in search of 'any deficiency no matter how minor.'" *Myersville*, 783 F.3d at 1322-23 (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)).

Petitioners present two related arguments under NEPA. First, petitioners contend that the Commission improperly segmented its environmental review by failing to examine the AIM Project and Algonquin's two other pipeline upgrade projects together in a single environmental statement. Second, petitioners submit that the Commission failed to give adequate consideration to the cumulative environmental impacts of the three upgrade projects. We find no basis to set aside the Commission's order on those grounds.

14

1.

Under the Council on Environmental Quality's regulations implementing NEPA, agencies must consider all "connected actions," "cumulative actions," and "similar actions" within a single environmental impact statement. 40 C.F.R. § 1508.25(a). "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). The rule ensures that an agency considers the full environmental impact of "connected, cumulative, or similar" actions before they are undertaken, so that it can assess the true costs of an integrated project when it is best situated to evaluate "different courses of action" and mitigate anticipated effects. *Id*. at 1313-14.

This court has developed a set of factors that help clarify when "physically connected projects can be analyzed separately under NEPA." *Id.* at 1315. As relevant here, when an agency considers projects non-contemporaneously, *see id.* at 1318, and when projects have "substantial independent utility," *id*. at 1316, separate environmental statements can be appropriate.

Applying those considerations in *Delaware Riverkeeper*, we concluded that the Commission had impermissibly segmented its review of four pipeline upgrades. The projects, we explained, were "connected and interrelated" and "functionally and financially interdependent," and they also had significant "temporal overlap," *id.* at 1319, because they were "either under construction" or "pending before the Commission for environmental review and approval" at the same time, *id.* at 1308.

In *Minisink* and *Myersville*, by contrast, we sustained the Commission's conduct of separate environmental assessments. In *Minisink*, we noted that the projects in question lacked the temporal overlap that had characterized the projects in *Delaware Riverkeeper*. Rather, the application for the later-in-time project had yet to be submitted when the main project was under consideration. *Minisink*, 762 F.3d at 113 n.11. In *Myersville*, we reasoned that, unlike *Delaware Riverkeeper*, the projects were "unrelated" and did not depend on one another for their justification. 783 F.3d at 1326-27.

Because the case before us is more in line with *Minisink* and *Myersville* than with *Delaware Riverkeeper*, we conclude that the Commission did not act arbitrarily and capriciously in declining to consider Algonquin's three projects in a single environmental impact statement. With regard to temporal overlap, the Commission issued the AIM Project certificate in March 2015, Algonquin submitted the application for Atlantic Bridge in October 2015, and Algonquin has yet to file the Access Northeast application. The projects thus were not under simultaneous consideration by the agency.

Nor are the projects "financially and functionally interdependent." *Del. Riverkeeper*, 753 F.3d at 1319. On that score, we consider "whether one project will serve a significant purpose even if a second related project is not built," *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987), and we look to the "commercial and financial viability of a project when considered in isolation from other actions," *Del. Riverkeeper*, 753 F.3d at 1316. In denying rehearing, the Commission observed that Algonquin's three projects "held separate open seasons," "executed individual precedent agreements" with largely distinct shippers, and "have different negotiated and recourse rates and separate in-service dates." Rehearing Order ¶ 75. In those circumstances, the Commission

reasonably concluded that "the projects do not depend on the other[s] for access to the natural gas market." *Id. ¶* 78.

Factual developments after the Commission's completion of environmental review for the AIM Project highlight the permissibility of conducting separate environmental assessments for Algonquin's three projects. Following issuance of the environmental impact statement for the AIM Project, the Atlantic Bridge Project was significantly curtailed: the project's planned capacity decreased by nearly 40 percent, and the length of pipeline to be replaced decreased by 88 percent. Atlantic Bridge Certificate Order ¶ 86 & n.82. If the Commission's environmental impact statement for the AIM Project had taken into account the Atlantic Bridge Project as then conceived, the review would have substantially overstated the environmental impact of the Atlantic Bridge Project. With regard to the Access Northeast Project, meanwhile, Algonquin withdrew the project from the Commission's pre-filing process in June 2017, and it is uncertain when (or whether) the project will go forward. Order Denying Stay, *Algonquin Gas Transmission, LLC*, 160 FERC ¶ 61,015, at ¶ 6 & n.13 (Aug. 21, 2017).

In short, the functional and temporal distinctness of the three projects, as underscored by factual developments concerning the Atlantic Bridge and Access Northeast Projects, substantiate that it was permissible for the Commission to prepare a separate environmental impact statement for the AIM Project.

2.

Relatedly, the joint petitioners contend that the Commission failed to give sufficient consideration to the cumulative environmental impacts of the AIM, Atlantic

Bridge, and Access Northeast Projects. This second species of petitioners' arguments under NEPA fares no better than the first.

An environmental impact statement must assess the "cumulative impacts" of a proposed action. *Sierra Club v. FERC*, 827 F.3d 36, 49 (D.C. Cir. 2016). A project's "cumulative impact" is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. To satisfy "hard look" review, an agency's cumulative impacts analysis must contain "sufficient discussion of the relevant issues" and be "well-considered." *Myersville*, 783 F.3d at 1324-25 (citation omitted). But importantly, the adequacy of an environmental impact statement is judged by reference to the information available to the agency at the time of review, such that the agency is expected to consider only those future impacts that are reasonably foreseeable.

At the time of the Commission's consideration of the AIM Project, the impacts of the Atlantic Bridge Project were reasonably foreseeable. And the Commission thoroughly considered the environmental effects of Atlantic Bridge throughout the cumulative impacts section of the AIM Project's environmental impact statement. The statement "contains sufficient discussion of" the cumulative impacts of Atlantic Bridge and is "well-considered." *Myersville*, 783 F.3d at 1325.

The cumulative impacts discussion of the Access Northeast Project is much more limited, and understandably so. At the time of the AIM Project's environmental impact statement, Access Northeast was months away from entering the pre-filing process and over a year away from issuance of a

notice of intent to prepare an environmental impact statement. Given Access Northeast's preliminary stage and the resulting lack of available information about its scope at the time, the project was "too preliminary to meaningfully estimate [its] cumulative impacts." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 513 (D.C. Cir. 2010); *see Minisink*, 762 F.3d at 113. Additionally, the AIM Project and Access Northeast would "not overlap in time," meaning the short-term impacts from constructing the former would abate before construction commenced on the latter, and no long-term cumulative impacts were reasonably anticipated. Rehearing Order ¶¶ 144-145. In light of "the uncertainty surrounding [Access Northeast], and the difference in timing between the two projects, this discussion suffices under NEPA." *Minisink*, 762 F.3d at 113.

None of this means that Algonquin will circumvent full consideration of the environmental impact of projects that continue to take shape. To the contrary, later projects can fully account for the cumulative impacts when those effects become better known. And in fact, the environmental assessment for the Atlantic Bridge Project considered the cumulative impacts of the Access Northeast Project once the latter project's details were better defined and its anticipated impacts better understood. Atlantic Bridge Certificate Order ¶¶ 98 n.98, 107-110 (citing Environmental Assessment at 2-129 to 2-130, 2-131 to 2-143). For purposes of the AIM Project, however, the Commission adequately considered the cumulative impacts of the other two projects based on the information then available to the agency.

B.

Petitioners next challenge the Commission's determination that the AIM Project posed no increased threat

to the Indian Point nuclear power plant in Westchester County, New York. According to petitioners, the Commission's conclusion is unsupported by substantial evidence. We disagree.

The AIM Project involved installing 2,159 feet of pipeline across the property of the Indian Point facility. The pipeline would be located 1,600 feet from the "power plant structures," and 2,370 feet from Indian Point's "protected security barrier around the main facility sites." Rehearing Order ¶ 197. During the Commission's consideration of the AIM Project, Entergy—the operator of Indian Point—undertook a safety evaluation as required by the relevant regulations. That evaluation determined that the project would pose no additional safety risks to its facility. The Nuclear Regulatory Commission (NRC) conducted an independent analysis and reached the same conclusion. Relying on those expert analyses, the Commission found that the AIM Project "would not pose any new safety hazards" to Indian Point. AIM Project Final Environmental Impact Statement at ES-8 (Jan. 23, 2015).

In evaluating an application for a Section 7 certificate, the Commission must determine that the proposed project is in the "public interest," which requires assessing potential "safety concerns." *Washington Gas Light Co. v. FERC*, 532 F.3d 928, 932 (D.C. Cir. 2008). If the Commission's safety findings are unsupported by substantial evidence, we vacate the certificate order. *Id.* at 932-33. Petitioners seek vacatur here, arguing that the Commission erred in adopting the NRC's safety finding concerning the Indian Point facility.

The Commission's factual findings are "conclusive" for our purposes if "supported by substantial evidence." 15 U.S.C. § 717r(b). Substantial evidence "requires more than a scintilla, but can be satisfied by something less than a preponderance of

the evidence." *Minisink*, 762 F.3d at 108 (citation omitted). The Commission's safety finding meets the substantial-evidence threshold.

The Commission of course can rely on expert reports in its decisions. *See Murray Energy Corp. v. FERC*, 629 F.3d 231, 238 (D.C. Cir. 2011). Here, it relied on two: Entergy's safety evaluation and NRC's confirming analysis. The Commission discussed those evaluations in its environmental impact statement, its certificate order, and its rehearing order, in support of its finding that the "AIM Project can safely operate near Indian Point." Rehearing Order ¶ 201. Those expert opinions qualify as substantial evidence supporting the Commission's safety finding, and the Commission acted well within its discretion in relying on them to grant Algonquin's certificate.

Petitioners contend that the Commission erred in accepting Entergy's and NRC's safety findings rather than those of competing expert analyses that found safety risks to Indian Point from the AIM Project. Specifically, petitioners and their experts fault Entergy and NRC for assuming that gas flow could be terminated within three minutes of a pipeline rupture, and estimating a blast radius based on that assumption. But whereas Entergy's analysis assumed a three-minute response time, NRC directly responded to the opposing experts' concerns about that assumption; after conducting an analysis that assumed a "catastrophic failure" and continuous gas flow for one hour, NRC still concluded that the pipeline posed no safety threat. AIM Project Final Environmental Impact Statement at 4-278. In ratifying NRC's "extensive formal responses" to petitioners' experts, the Commission found NRC's assumptions reasonable and its analysis persuasive. Rehearing Order ¶ 201.

In general, we defer to the Commission's "resolution of factual disputes between expert witnesses," and accept its decision "to credit" one expert's "conclusions" over another expert's if its choice is "reasonable." *Murray Energy Corp.*, 629 F.3d at 239 (citation omitted). Here, the Commission was faced with Entergy and NRC's analyses, on one hand, and critiques from two independent experts, on the other. It permissibly decided to credit the NRC's expert conclusions, and to accept that NRC's "extensive formal responses" had adequately addressed the opposing experts' concerns. Rehearing Order ¶ 201.

The expert conclusion adopted by the Commission, moreover, was that of another federal agency. Agencies can be expected to "respect [the] views of such other agencies as to those problems" for which those "other agencies are more directly responsible and more competent." *City of Pittsburgh v. Fed. Power Comm'n*, 237 F.2d 741, 754 (D.C. Cir. 1956). So, for instance, we sustained an agency's decision against undertaking a rulemaking in reliance on the opinion of "other government agencies and non-governmental expert organizations with specific expertise" on the matter. *EMR Network v. FCC*, 391 F.3d 269, 273 (D.C. Cir. 2004).

In that regard, NRC has particular expertise in assessing external threats to the nuclear facilities it regulates. *See, e.g.*, *New York v. NRC*, 824 F.3d 1012, 1019-20 (D.C. Cir. 2016). The Commission determined that it was "satisfied as to [NRC's] competence and the validity of their basic data and analysis," Rehearing Order ¶ 203, and chose to credit NRC's safety conclusions. We see no basis to reject the Commission's decision to do so.

C.

As their final ground for overturning the Commission's grant of a Section 7 certificate, petitioners contend that a third-party contractor that the Commission relied on to prepare the environmental impact statement—Natural Resource Group—had a conflict of interest. Petitioners did not present that objection to the agency. We therefore lack jurisdiction to consider the issue unless we conclude that "there is reasonable ground for [petitioners'] failure" to raise the argument on rehearing before the agency. 15 U.S.C. § 717r(b).

In a case involving an analogous exhaustion provision and a conflict-of-interest claim, we held that a petitioner had demonstrated a "reasonable ground" to excuse the lack of exhaustion because the petitioner "had no reason during the [environmental review] process to suspect the alleged defects in the selection and supervision of [the contractor]." *Communities Against Runway Expansion, Inc.* (*CARE*) *v. FAA*, 355 F.3d 678, 686 (D.C. Cir. 2004). Our decision in *CARE* controls here in light of the similar circumstances. We therefore have jurisdiction to consider the merits of petitioners' conflict-of-interest claim.

We reject petitioners' argument on the merits, however. Petitioners' claim of a conflict of interest rests on an allegation that Natural Resource Group was also hired by a consortium that included Algonquin's parent company to perform public-affairs work in connection with a separate project. That ostensible conflict did not arise until the environmental-review process for the AIM Project was substantially underway. Neither the Commission nor Natural Resource Group failed to follow the conflicts disclosure rules in place at the time. *See* Fed. Energy Reg. Comm'n, *Handbook for Using Third-Party Contractors to Prepare Envtl. Documents for Nat. Gas*

*Facilities & Hydropower Projects* at 4-1 to 4-6 (Dec. 2014). In addition, the Commission later once again hired the Natural Resource Group to assist with the environmental statement for the Atlantic Bridge Project. In doing so, the Commission found that the supposed conflict identified by petitioners here was not a "disqualifying conflict" under the Commission's rules. Letter from Chairman Norman Bay to Sen. Elizabeth Warren 2, FERC Docket No. CP16-9 (July 19, 2016). Petitioners offer no basis for disagreeing with that conclusion.

Finally, even if petitioners had identified an actual conflict of interest, it would afford a ground for invalidating the environmental impact statement only if it rose to the level of "compromis[ing] the objectivity and integrity of the NEPA process." *CARE*, 355 F.3d at 686-87 (formatting modified). That bar has not been met here.

\* \* \* \* \*

For the foregoing reasons, we dismiss the City of Boston Delegation's petition for review for lack of jurisdiction, and we deny the remaining petitions for review.

*So ordered.*